Withers J.
delivered the opinion of the Court.
The prisoner was tried upon a charge of homicide, characterized by circumstances which must place his case among the most shocking that have stained the annals of our criminal jurisprudence. He has obliterated, in blood, from the face of the earth, apparently with deliberate hand, every vestige of his entire family—comprising a wife, who as the testimony indicates, was virtuous, constant and blameless; and two children, blooming and lovely, clothed in innocence of the tenderest years. This dreadful tragedy seems to have been perpetrated at a moment when that wife was engaged in preparing for himself and his dependent offspring, an humble repast from *505 those scanty stores, to which his own improvidence and vice had reduced her—and if one gleam of consolation can spring from this dismal scene, it must bo derived only from the supposition that this wife and her offspring have been released from the torture of an indefinite and protracted suffering; and though all were hurried to the bar of God by a cruel and unnatural hand, she, perhaps, may have plead at the dread tribunal, that she ceased to live while actually engaged in the virtuous offices of maternal and conjugal affection and duty—and they, the uncorrupted innocence of childhood.
It cannot be, but that to all men; in an eminent degree to him who is a husband and a father, the recital of the particulars of this terrible deed instantly suggests the inquiry, in what motive of an unperverted mind shall wc seek the cause? And if a jury, or this Court, were required to designate the rational or sane impulse, that could have impelled the prisoner to such butchery before he could be condemned, then he might escape-But it cannot be seriously insisted that this would present the true issue. The perpetration of the act is established. The prisoner’s defence below, his appeal to this tribunal, rested upon the allegation, proceeding from him, that though he slew his wife and children, and mangled their bodies in a manner the most brutal and barbaimis, yet he was driven by insane impulse; that by some species and degree of mental disorder, in the intellectual or moral attributes, or in both, his judgment was so far dethroned, or his reason so far obscured, and the action of his free will so far suspended or perverted, that he deserves to be regarded but .as the mere physical agent in the perpetration of the homicide, and held irresponsible to the sanctions of the criminal law. Whatever might be the sudden response of a heart jealous of the honor of our nature, and in which there lives a virtuous sentiment to be shocked by the amazing turpitude of this act, the stern and solemn answer must be, that as in the case of every other plea, intended to mitigate, to excuse, or to justify an established homicide, so in this, the positive existence of that degree and kind of insanity, that shall work a dispensation to the prisoner, is a fact to be proved, as it is affirmed by him to the satisfaction of the jury, *506 who are the safest, and the proper arbiters of the question. Such inquiry, it is too true, will often lead us into those awful mysteries that enshroud the organization of the human being—an inquiry, which, seeking to detect the unseen action of the intellect upon the body, must often confound and appal the boldest^ the wisest, the most acute; and, manifesting an universal ignorance of all that is certain, must subject the philosopher, the judge, the wise, and the unwise, to a reverential humility.
Yet, the Court has a function to discharge, even in this region of twilight. It can be no other than, as each case shall arise, to erect the best standard for the guidance of the jury, that the lights oí the age, however glimmering in this mysterious region, have afforded to jurisprudence, and endeavor to hold, with a steady hand, the scales of justice, even though the issue be life and death.
We are, therefore, to inquire whether the landmarks afforded to the jury, b}7 the presiding Judge who tided the prisoner, were such as the law prescribes and sanctions.
We are of opinion, that in this difficult undertaking, there was no error of which the prisoner can properly complain.
It might be enough soto announce—but we deem it due to the gravity of the cause and to the argument of counsel, to review briefly, the positions that have been assumed for the defence.
The first ground alleges as error, “because his Honor charged the jury, that if mania a potw existed during the fit of intoxication, the party would not be excused for any act committed under its influence.”
The proposition, in the words of the report, was this: “that mania, which might arise during the fit of intoxication, could not be distinguished from other extravagancies of drunkenness so long as the ordinary time of intoxication lasted, and whilst the ordinary evidences of intoxication were manifested; although it would be like other mania a potu, if an inflammation of the brain, or other direct effect of stimulants, occurring during the intoxication, and producing insanity, should continue after the intoxication ceased.”
This proposition, in the form given to it, was more favorable *507 to the prisoner than those terms would have been which are used and authorized by Hale, adopted by Blackstone, and supported by the authority of Coke. In the words of Hale, (1 P. C., 32)—“although the simple phrenzy occasioned immediately by drunkenness, excuses, not in criminals, yet, if by one or more such practices, an habitual or fixed phrenzy be caused,” this shall excuse. In the case of Drew, (5 Mason, 28,) the proposition was laid down by Judge Story thus: “In general, insanity is an excuse for the commission of any crime, because the party has not the possession of his reason, which includes responsibility. An exception is, where the crime is committed while the party is in a fit of intoxication, and while it lasts, and not, as in this case, a remote consequence superinduced by the antecedent exhaustion of the party arising from gross and habi. tual drunkenness. Had the crime been committed while Drew was in a fit of intoxication, he would have been liable to be convicted of murder.” It is quite clear that the doctrine held on the circuit, was in no degree stronger than that announced by Judge Story, and by no means so strong against the prisoner as that sent down to us by the earlier luminaries of the English law; for wo are informed by the report that the prisoner was not held to the proof of an “habitual and fixed” phrenzy or mania, but that the terms, settled, permanent, fixed, were carefully avoided in the charge to the jury, and they had the opinion of the Court that the madness of an hour would excuse as well as that of a year. But this doctrine had no place, in any form, in the facts of the case, for there was no ground to suppose that the party was intoxicated when the act was committed.
The second ground is well answered also, by the extract from the report above quoted. It was not exacted of the prisoner that he should prove a permanent and settled disease of both body and mind, or either of them. We need not, therefore, enlarge upon that.
The third ground imputes error to the charge in this: “that there could be no delirium sufficient to excuse, where the memory of the party was alone affected.”
No other form of insanity was urged on the trial in behalf of *508 the prisoner, or has been insisted on here, except that of delirium tremens. This consequence of drunken debauchery is described to be almost always accompanied by tremor. The patient (as we are informed by medical writers) is restless, anxious, sleepless, suspicious, timid and cunning—deems himself in a strange place, and under control, from which he is constantly endeavoring to escape—conceiving himself surrounded by loathsome objects, such as toads, serpents and scorpions; and tormented by such optical illusions, he seeks to escape. It was insisted here, that the evidence of Hinson and Jenkinson established a case of delusion on the part of the prisoner on the night before he perpetrated the deed. Now, the charge on this subject went no farther than to suggest that the particulars stated by these witnesses indicated rather a bewilderment of the memory, than such optical illusions as were said to attend generally delirium tremens. But the criterion of the delusion so much insisted on here, (and well supported in Hatfield’s case,) was submitted to the jury as affording the most satisfactory characteristic of insanity. The delusion which it is insisted was discovered in the prisoner on Friday evening, is traced to his assertions that he had insulted a good many ladies, that he had visited sundry houses in the neighborhood, which, it is said, he had not for some time seen, and that he had committed some great crime, which he accused Jenkinson of concealing from him. Conceding that, according to the arbitrary definitions of metaphysi-cians, who would vainly attempt to dissect the mind as a surgeon would the body, it might not be clearly true that the faculty of memoi'y only was at fault in these capricious observations, it was still left to be considered, whether its principal handmaid, the law of association, had not combined with persons to whom he had lately been rude, those whom he had not affronted, and, driven by the goadings of a disturbed conscience in a dreamy slumber, had, by overleaping time, brought in conjunction to a confused memory the remoter scene at Bradford’s, and the later transactions at Broughton’s. If, however, the phenomena in question be resolvable only by the supposition of existing delusion, then, as has been already remarked, the prisoner had the full benefit of that view of the subject. Nor *509 must we forget that the delusion, (if it were such in the legal sense,) was traced no nearer to the fatal moment than the evening preceding, and was not shown to have had any connexion with the hloody deed, to have vanished with its perpetration, or to have existed thereafter. There was no evidence to warrant the belief that there was a general subversion of reason, a general suspension of free will. Surely Hinson and Jcnkinson did not suspect this on Friday evening, or they would not have loft a madman and relative at large, nor could his poor wife have suspected this, else site would have sought protection. To imply a general disorganization of mind, would be but a naked assumption—it would be to presume more than was suggested here or on the trial, and would want any basis in the testimony. Supposing, then, the fact to have been established, that there was delusion, or unsoundness of mind, on some particular point, it nowhere appears that the act of the prisoner was the consequence of such delusion as the effect of a cause merely; much less docs it appear that the delusion (whatever we may allow it to have been,) satisfied the mind of the prisoner that the act flowing from it was justifiable, if there was delusion, has the prisoner shown of what faculty, whether of one or more, on what subject, whether his insanity was moral or intellectual? whether a false assumption, acted upon as true, has conducted him to the perpetration of this catastrophe? If so, what was the assumption? wherein connected with iris wife and children? In what portion of the testimony shall we seek for that morbid delusion of any faculty, moral or intellectual, which may excuse, when the act is the immediate unqualified offspring of the hallucination? What fact existed only in the morbid belief of the prisoner, but which, if it were indeed a reality, would have justified or excused the act? Alas! for this unhappy man, he was sane, (so we must conclude,) when, twelve or fifteen months before the fatal morning, he prefigured the sad event in terms most fearfully exact. Before his wife should plough (he said) as Barwick’s did, he would cut her throat, his children’s, and his own. Substantially the contingency had occurred— produced by his own unmanly conduct, when the horrid prediction of a sane moment was to be fulfilled. What was there *510 to show that the conceit of a sane mind became the act of a madman’s hand? Had he executed the deed immediately that he threatened it, what then would have been his defence? Had he pillaged his neighbors goods, from time to time, to ward off from his own the fate ofBarwick’s wife, instead of holding the plough himself, in what would he have founded a plea of insanity? Had he labored successfully for the support of his family-had he encountered with manly resolution the obligations of an husband and a parent—had there in fact been no danger that his wife’s necessities were to be such as Barwick’s—and yet it had been shown that the prisoner really thought so and acted upon the belief—then, indeed, it might have been urged with more success, that there was evidence of delusion. Unhappily for the prisoner, the shame and degradation of his family, which he had threatened to wash out in their blood and his own, brought on them by himself, rendered the more irretrievable by his failure in a last effort at reformation, though stimulated and encouraged by his wife—was not the spectre of a delusion, it was a sad reality, and presented the contingency which was to work their destruction, not from the mad phrenzy of a moment, but it may be by the wicked execution of an idea long before lodged in a brain that had given it form and semblance.
It will never do to permit the excessive indulgence of a feeling natural to the most sane, the mere morose brooding of a heart “devoid of social duty and fatally bent upon mischief,” to operate the exemption of the accused, else immoderate rage or lust will come to excuse the most atrocious acts. Though it is, confessedly, beyond the power of human learning to define the misty line that separates violent passion from insanity, yet, as a case arises, the prisoner must be held obligated to produce the evidence that will enable the jury, aided by the best lights which the bench can afford them, to place him on the one side or on the other. It will never do so to administer the law, on this most difficult and mysterious subject, as practically to throw upon the prosecution the office of establishing the sanity of the accused.
As to the 4th ground, to wit, “because his Honor charged that no delusion was evidence of insanity, except delusion of things *511 present and supposed to be transpiring at the time,” it is sufficient to remark that the proposition set forth was not. as seems to have been apprehended, submitted to the jury; but with reference to the characteristics of mania a poiu, or delirium tremens, as described on the trial and in the books, and which was made the basis of the prisoner’s defence, the observation was made that the optical illusion said to attend that disease was supposed to relate to things believed to be present (as obviously such illusion must;) whereas the delusions imputed to the prisoner on Friday evening seemed to relate to things absent and pa«t.
It is finally insisted, that the evidence made a case of insanity, and the jury should have been so charged.
This Court is by no means prepared to sanction such language in a charge to a jury, as matter of legal instruction to them, in any case where testimony presents a dubious question; much less would we hold it to be proper in the case now before us. If this Court could come to that conclusion, and we have examined the case with deep solicitude, it would be remitted in virtue of the high discretion entrusted to us, to the revision of another jury.
But upon a review of the whole cause, what are the considerations really relied upon to establish the insanity of the prisoner?
1. The overwhelming barbarity of the act. The prisoner has put to death the unoffending mother of his children, and those children themselves, still more unoffending. For all, it is urged, he has exhibited the usual marks of affection—save, however, in the important particular, that by habits of thriftless vice he had rendered himself unworthy of such a family—had reduced them to penury, and thus beheld in them the living memorials of his own shame and reproach; and having butchered them, he sought to destroy his own life.
It is quite clear that if we admit the dispensing power of such reasoning, no man can ever be convicted of the murder of his family, if no more can be proved but the homicide itself, for the more unnatural and brutal the crime, the stronger would become the ground of defence. Nor should we find encour *512 agement for this in the Courts of England, for it is but recently (see the Queen v. Higginson, 47 Eng. Com. L. Rep.,) a prisoner was upon trial for the murder of his little son, and the question being whether he had first killed him or had buried him alive, lie rose in Court and said, “I buried him alive:” no presumption of insanity was urged, and he was convicted. And as to the attempt of Stark upon bis own life, it is obvious to remark that even if suicide be considered as necessarily proceeding from insanity, (which need not be affirmed or admitted,) the attempt to commit it would furnish to a wicked and designing felon, too convenient a shelter to be yielded to such by the advice of this Court.
2. It is urged, moreover, that the prisoner suffered under delirium tremens, by some identified with mania a potu. We have looked in vain for the proof of this very material allegation. Wc can discover no warrant for such conclusion from what is said by the two physicians who saw the prisoner soon after the tragedy, for they believe he was not so affected. Nobody who then saw him establishes the existence of those symptoms which characterize this condition, unless, indeed, we may so regard the solitary fact, that he uttered an incoherent expression concerning a hawk. It is not necessary that this should be imputed to artifice. It is enough, that, if it were not a mere trick, it may have been an optical illusion, resulting from loss of blood. And after all, who but the jury shall determine the fact? And why shall we hesitate, when we see no cause to complain of the manner in which it was submitted to them, upon such light circumstances as the one just mentioned, and the vagaries of the night before, as detailed by Llinson and Jenkinson? Were we to send this case back, and thus authorize the inference that we had detected insanity from the testimony adduced, it is scarcely too much to say, that we should be, without example, among that long list of cases, consulted upon this occasion, wherein this species of defence has been urged in some one or other of its infinite variety of forms.
If, as was contended, delirium tremens, or anv other form of insanity, existed on Friday night, and continued up to the period of the fatal deed, whereupon it vanished with the flowing of *513 blood from the prisoner’s wound, the jury might well have demanded, and failed to perceive the answer—why did the parly, when a ray of reason again beamed upon his mind, maintain a stoical, stubborn indifference, when the eye of the husband and the father beheld the awful and complete havoc which his own hand had spread throughout his household ? Why apprehend that the gallows was the end to which he was destined, if he knew or believed himself to be irresponsible ? Why withhold an answer touching his wife and children? If, on the other hand, the paroxysm yet continued, and is made to account for the phenomenon, where is the evidence that it so continued 1
The standard of a knowledge of right and wrong, or a capacity to understand the difference between them, as the criterion of sanity or insanity, so earnestly contested at the bar, was not prescribed in this case or recommended to the jury; and hence we need not enter upon the question presented by such a proposition, nor vainly attempt to define with precision any standard upon the subject.
Our painful conclusion is, that there is nothing to justify the interference of this Court with the finding of the jury, and that though we cannot, prove the prisoner’s sanity, yet we see in his evidence (and to that only we are to look) no sufficient reason to question it; and having had a fair trial, with all the humane allowances of the law, before a jury of his peers, their solemn arbitrament must seal his fate.
The motion is, therefore, dismissed.
Evans J., Wardlaw J,, and Frost J., concurred.