2006 VT 55

## State of Vermont v. Jacob A. Sexton

[904 A.2d 1092]

No. 03-331

Present: **Amestoy, C.J.,**[1] **Dooley, Johnson, Skoglund and Reiber, JJ.**

Opinion Filed June 9, 2006

---

[1] Chief Justice Amestoy sat for oral argument but did not participate in this decision.

*Robert Simpson*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellant.

*Matthew F. Valerio*, Defender General, and *Anna Saxman*, Deputy Defender General, Montpelier, and *William A. Nelson* (On the Brief), Middlebury, for Defendant-Appellee.

¶ 1. **Reiber, J.** We accepted this interlocutory appeal to consider whether a defendant charged with murder may assert either the defense of diminished capacity to reduce the offense to manslaughter, or insanity to excuse the offense entirely, where the voluntary use of illegal drugs was an essential causal factor in the defendant's psychotic state at the time of the offense. Consistent with the law of this and other states, we conclude that a defendant in these circumstances may argue for a reduction of the offense based upon an inability to form the requisite intent to commit murder, but may not be relieved entirely of responsibility for his or her criminal acts. Accordingly, as explained more fully below, we affirm in part, reverse in part, and remand for further proceedings.

¶ 2. Although this appeal is from a pretrial ruling, the material facts are largely undisputed. On the night of September 27, 2000, police found a Japanese exchange student, Atsuko Ikeda, lying in the street in Winooski. Ikeda had suffered serious injuries, and died shortly after transport to the hospital. During the ensuing investigation, defendant walked onto the crime scene and lay down on the street in front of a police cruiser. Upon questioning by the police, defendant reportedly said, "Just cuff me, I know I did something bad, I just don't know what." Defendant was charged with Ikeda's murder.

¶ 3. While in custody, defendant informed the police that, on the day in question, he had killed his cat and then gone outside intending to kill a person. He recalled lunging at a woman passing on a bicycle (later identified as Ikeda) and then beating her repeatedly until she stopped moving. Defendant later told psychiatrists that he had taken a variety of illegal drugs during the six months preceding the incident. Defendant recounted that for about two months, in July and August 2000, he took many "hits" of LSD, and that his last reported use of LSD was two to three weeks before the September killing. Defendant explained that on the night of the incident he felt that he needed to kill people and "gather their souls."

¶ 4. At defendant's arraignment on a charge of second-degree murder, the court ordered a psychiatric evaluation of defendant's

competency and sanity.[2] In December 2000, Dr. Robert Linder, the court-appointed psychiatrist, filed a lengthy report with the court, ultimately concluding that defendant was insane at the time of the offense. The conclusion was based on a series of interviews with defendant and others, defendant's psychiatric and family history, and a battery of psychological tests from which Dr. Linder inferred that defendant was in a florid psychotic state at the time of the crime that prevented him from appreciating the wrongfulness of his conduct or conforming his conduct to the requirements of law. Dr. Linder's preliminary diagnosis was that defendant suffered from either a previously undiagnosed mental disease involving a schizophrenic disorder, or a substance-induced psychosis. At a later deposition in 2002, Dr. Linder noted that defendant's psychotic thoughts had largely resolved and that he had returned to his "usual self," suggesting a primary diagnosis of schizophreniform disorder, in which psychotic symptoms last between one to six months.

¶ 5. In his December 2000 report, Dr. Linder indicated that defendant's mental state had improved over the course of their interviews and that he appeared to be competent to stand trial. Based on the report, the parties stipulated to defendant's competency, and the court scheduled a hospitalization hearing. Following the hearing, the court found that defendant was a person in need of treatment and ordered him committed to the Vermont State Hospital.

¶ 6. In February 2001, defendant notified the State that he intended to present expert testimony in support of an insanity defense, and the court granted the State's motion for an independent psychiatric evaluation. In April, the State's psychiatrist, Dr. Albert Drukteinis, filed a report concurring in Dr. Linder's opinion that defendant was psychotic at the time of the offense, but concluding that it was caused solely by defendant's voluntary use of illegal drugs. Although Dr. Drukteinis observed signs of a personality disorder with narcissistic features, he found no evidence that defendant suffered from a major thought disorder such as schizophrenia. At a subsequent hearing on the State's motion to amend defendant's conditions of release, defendant's treating psychiatrist, Dr. Margaret Bolton, also diagnosed defendant as

---

[2] The court later granted the State's motion to amend the information to charge Sexton with first-degree murder, but the State was subsequently granted leave to amend the charge back to second-degree murder.

having a personality disorder, and agreed that defendant did not suffer from any major mental illness such as schizophrenia, as reported by Dr. Linder, or borderline personality, as suggested in an earlier report by Dr. Bertold Francke. In June 2002, the court transferred custody of defendant to the Department of Corrections after concluding that his continued hospitalization was no longer justified.

¶ 7. In July 2002, the State filed a motion in limine seeking to prevent defendant from presenting an insanity defense at trial, arguing that Vermont law does not recognize temporary insanity caused by the voluntary use of drugs. The State also moved to preclude a diminished capacity defense, asserting that second-degree murder based on wanton disregard for the likelihood that one's actions would naturally cause death or great bodily harm is a general intent crime to which the defense has no application. After the parties submitted supplemental briefing, the court requested that defendant provide a concise statement of his theory as to the insanity defense. Defendant, in response, submitted a supplemental letter from Dr. Linder, reaffirming his earlier opinion that defendant was in the midst of a severe psychotic episode at the time of the offense, resulting from either a substance-induced psychosis or an underlying mental illness, such as schizophrenoform disorder, caused by the ingestion of illegal drugs in combination with an underlying psychological vulnerability that predisposed him to such a reaction.

¶ 8. In March 2003, the court issued a written decision, concluding that second-degree murder based on wanton disregard of the likelihood that one's conduct would naturally cause death or great bodily harm is a specific intent crime in Vermont. Therefore, it held that defendant was entitled to rely on the defense of diminished capacity due to voluntary intoxication. The following June, the court issued a second decision, concluding that defendant was also entitled to argue that he was legally insane at the time of the killing. Although the court ruled that "an individual whose mental state is altered solely because of the consumption and abuse of illegal drugs" may not assert an insanity defense, it found that one whose consumption of illegal drugs activates a latent mental disease or defect resulting in a psychotic reaction is entitled to a complete defense to the crime charged, unless the defendant knew or had reason to know that the drugs would elicit such a reaction.

¶ 9. The State moved for permission to pursue an interlocutory appeal of both orders. The trial court granted the motions, certifying the following three questions, which we accepted for review:

(1) Does the issue of diminished capacity caused by voluntary intoxication by means of illegal drugs apply to a charge of second degree murder based upon wanton disregard of the likelihood that one's conduct would naturally cause death or great bodily harm, so as to reduce the offense to voluntary manslaughter?

(2) Does the issue of diminished capacity caused by a combination of pre-existing mental condition and the effects of voluntary consumption of illegal drugs apply to a charge of second degree murder based upon wanton disregard of the likelihood that one's conduct would naturally cause death or great bodily harm, so as to reduce the offense to voluntary manslaughter?

(3) Is the following a correct statement of Vermont law:

> The term "mental disease or defect" as used in 13 V.S.A. § 4801 includes a mental condition caused by the voluntary consumption of illegal drugs if the drugs activate a latent mental disease or defect, and as a result of that mental disease or defect the individual has lost the capacity to appreciate the criminality of his conduct, or has lost the capacity to conform his conduct to the requirements of the law, unless the individual knew or had reason to know that the drug would activate the illness. The resulting disease or defect must be recognized medically and must exist at the time of the offense, independent of any temporary intoxication or high that the drugs caused. It does not matter that the mental disease or defect was not permanent, if the condition lasted for a substantial time after the intoxicating effects of the illegal drugs had worn off. A mental disease or defect cannot be caused solely by the consumption of an illegal drug.

I.

¶ 10. This interlocutory appeal presents questions of law, and our review is therefore nondeferential and plenary. *State v. Koch*, 169 Vt. 109, 112, 730 A.2d 577, 580 (1999).

¶ 11. The first two certified questions ask us to reexamine the common law of diminished capacity. The State suggests that our recent decisions have made such a defense unavailable to a defendant charged with second-degree murder based on a wanton disregard of the likelihood that the defendant's conduct would naturally cause death or great bodily harm. We disagree, and affirm the district court's ruling.

■ ¶ 12. Title 13 V.S.A. § 2301 defines the degrees of murder as follows:

> Murder committed by means of poison, or by lying in wait, or by wilful, deliberate and premeditated killing, or committed in perpetrating or attempting to perpetrate arson, sexual assault, aggravated sexual assault, robbery or burglary, shall be murder in the first degree. All other kinds of murder shall be murder in the second degree.

This skeletal statutory definition has existed largely unchanged since 1869, and the Legislature has left it to this Court to flesh out the elements of second-degree murder. *State v. Johnson*, 158 Vt. 508, 517, 615 A.2d 132, 137 (1992). We have distinguished between first- and second-degree murder based on the presence or absence of "willfulness, deliberation and premeditation," *State v. Hatcher*, 167 Vt. 338, 343, 706 A.2d 429, 432 (1997), but have traditionally held that a person must act with "malice" to be guilty of either degree of murder. *State v. Long*, 95 Vt. 485, 496, 115 A. 734, 739 (1922). Our more recent decisions have concluded that the term "malice" is overly confusing, however, and we have directed the trial courts to instruct jurors on the specific mental states requisite to a particular charge. See, e.g., *Johnson*, 158 Vt. at 519, 615 A.2d at 138. To this end, we have reiterated that the crime of second-degree murder requires "'an intention to kill, an intention to do great bodily harm, or a wanton disregard of the likelihood that one's behavior may naturally cause death or great bodily harm.'" *Hatcher*, 167 Vt. at 344, 706 A.2d at 433 (quoting *State v. Doucette*, 143 Vt. 573, 582, 470 A.2d 676, 682 (1983)).

■ ¶ 13. We have long held that diminished capacity due either to voluntary intoxication, *In re Plante*, 171 Vt. 310, 317, 762 A.2d 873, 878 (2000), or to a mental disability, *State v. Wheelock*, 158 Vt. 302, 311, 609 A.2d 972, 978 (1992), can mitigate murder to voluntary manslaughter. The traditional rationale supporting a diminished capacity defense posits that a defendant's decreased faculties or awareness may preclude the specific intent to commit murder, thus reducing the crime

to voluntary manslaughter. *State v. Pelican*, 160 Vt. 536, 539, 632 A.2d 24, 26 (1993). In *State v. Blish*, 172 Vt. 265, 272, 776 A.2d 380, 386 (2001), however, we announced that "the intent component of voluntary manslaughter is the same as that required for second degree murder." We went on to state that the "critical factor distinguishing second degree murder from voluntary manslaughter is not the mental state of the actor, but the existence of mitigating circumstances." *Id.* Thus, we adopted the position that "'the correct way of explaining [diminished capacity] is as a defense mitigating the degree of homicide from murder to voluntary manslaughter.'" *Id.* at 270, 776 A.2d at 385 (quoting *Pelican*, 160 Vt. at 543, 632 A.2d at 29 (Morse, J., concurring)).

¶ 14. The State argues that our efforts to modernize the language of homicide have actually created two distinct classifications of second-degree murder: the first applicable to a defendant who intended to kill his victim, and the second applicable to a defendant who acted with wanton disregard for the consequences of his or her actions. The State contends that second-degree murder based on "wanton disregard" is actually a general intent crime, to which the diminished capacity defense has no application. We are not persuaded. As discussed above, second-degree murder requires either an intent to kill or do great bodily harm, or "a wanton disregard of the likelihood that one's behavior may naturally cause death or great bodily harm." *Hatcher*, 167 Vt. at 344, 706 A.2d at 433 (quotations omitted). Although we originally presented this tripartite definition as an explication of the elusive term "malice," which has long been the distinct mens rea — the specific intent — separating murder from manslaughter, *Doucette*, 143 Vt. at 582, 470 A.2d at 682, the State now contends that "wanton disregard" actually denotes a subset of recklessness, or general intent. Despite the historical connection between the term "wanton" and the term "malice,"[3] the State contends that a combined reading of several recent decisions indicates that we now consider "wanton disregard" a species of general intent.

¶ 15. The first step in the State's argument relies on our recent observation that the phrase "wanton disregard" describes a mental state equivalent to "extreme indifference." *Blish*, 172 Vt. at 272-73, 776

---

[3] See, e.g., *State v. Shabazz*, 169 Vt. 448, 454, 739 A.2d 666, 670 (1999) (defining "wanton" as more than "mere recklessness," and describing its "long use[] to define malice aforethought for the purposes of criminal homicide").

A.2d at 386. The State next points out that we have held that diminished capacity due to voluntary intoxication is no defense to a charge of aggravated assault when the defendant is accused of acting recklessly "under circumstances manifesting *extreme indifference* to the value of human life." *State v. Allen*, 169 Vt. 615, 616, 738 A.2d 113, 114 (1999) (mem.) (citing 13 V.S.A. § 1024(a)(1)) (emphasis added). In these two steps, then, the State contends that "wanton disregard" is equivalent to "extreme indifference," which, in turn, is a species of recklessness to which the diminished capacity defense does not apply. At the very least, the State argues that *Allen* creates an unexplained split in the law of "extreme indifference," whereby diminished capacity due to voluntary intoxication applies to murder, but not to some types of aggravated assault.

¶ 16. The reason for this split, however, is that the Legislature has acted to modernize the statutory language defining aggravated assault, while it has chosen to leave the common-law definition of second-degree murder undisturbed. Compare 13 V.S.A. § 1024(a)(1) (amended in 1972) with 13 V.S.A. § 2301 (substantially unchanged since 1869). The mental state defined in § 1024(a)(1) — "purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life" — closely reflects the terminology of the Model Penal Code. Model Penal Code § 2.02(2) (1985); see also *State v. Trombley*, 174 Vt. 459, 461, 807 A.2d 400, 404 (2002) (mem.) (interpreting § 1024 pursuant to the Model Penal Code). The Model Code moves away from the old distinction between specific and general intent, and does not recognize intoxication as a defense to crimes that require only a showing of recklessness. Model Penal Code § 2.08(2). Because the assault language in our statute closely mirrors the Code, we essentially adopted the Code's position on diminished capacity. Acknowledging the three separate mental states delineated in the statute, we concluded that diminished capacity would apply to assaults committed purposely or knowingly, but held that the defense of voluntary intoxication is not available when a defendant acts recklessly. *Allen*, 169 Vt. at 616, 738 A.2d at 114.

¶ 17. The Legislature has not modernized the statutory definition of second-degree murder, however, which remains a creature of the common law, and therefore is subject to the traditional distinction between specific and general intent. The common law allows the defense of diminished capacity — due either to intoxication or mental defect — to specific intent crimes, and we have consistently made the defense available to negate the specific intent necessary to commit

second-degree murder. *State v. Shaw*, 168 Vt. 412, 416, 721 A.2d 486, 490 (1998). All three prongs of the mens rea required for second-degree murder — intent to kill, intent to cause great bodily harm, or wanton disregard of the likelihood that one's conduct would naturally cause death or great bodily harm — simply define the term "malice," *Doucette*, 143 Vt. at 582, 470 A.2d at 682, which has always been a species of specific intent. The State's arguments are therefore unavailing, and defendant is entitled to present evidence that his diminished capacity, due either to voluntary intoxication or mental disability, prevented him from forming the specific intent to commit second-degree murder.[4]

## II.

¶ 18. The final certified question asks us to determine whether defendant can present an insanity defense based on his claim that the ingestion of illegal drugs activated a latent mental disease or defect resulting in a psychotic reaction that rendered him unable to appreciate the criminality of his conduct or conform his conduct to the requirements of law.

¶ 19. Unlike diminished capacity, which mitigates a defendant's culpability, legal insanity is a complete defense to any crime. *State v. Messier*, 145 Vt. 622, 628, 497 A.2d 740, 743 (1985). The insanity defense has a long history at common law. See B. Elkins, *Idaho's Repeal of the Insanity Defense: What Are We Trying to Prove?*, 31 Idaho L. Rev. 151, 161 (1994) (discussing the historical roots of the insanity defense). The modern standard dates to the early nineteenth-century House of Lords' decision in *M'Naghten's Case*, 8 Eng. Rep. 718, 722 (H.L. 1843), which looked to whether the defendant knew the nature or quality of his actions, or understood that they were wrong. The standard has since evolved through a variety of permutations, including the so-called Durham test, from *Durham v. United States*, 214 F.2d 862 (D.C. Cir. 1954), which asked whether the defendant's

---

[4] The district court submitted the second certified question in response to the State's contention that defendant cannot claim diminished capacity if his voluntary intoxication exacerbated an underlying mental defect or disability. A straightforward application of the principles described above, however, demonstrates that the State's position is without merit. Simply put, if a defendant can claim diminished capacity based on the effects of voluntary intoxication, it follows a fortiori that a mentally disabled defendant is entitled to the same defense.

crime "was the product of mental disease or mental defect," *id.* at 875, which in turn influenced the insanity standard set forth in the Model Penal Code § 4.01. The latter forms the governing standard in most of the federal circuits and roughly half the states, including Vermont. *Id.* § 4.01, cmt. at 175-76. Our definition is set forth in 13 V.S.A. § 4801(a)(1), as follows:

> A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks adequate capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

¶ 20. Although a separate section of the Model Penal Code provides that "[i]ntoxication does not, in itself, constitute mental disease within the meaning of Section 4.01 [the insanity section]," Model Penal Code § 2.08(3), we have not adopted this provision in Vermont, and our insanity statute does not define "mental disease or defect" other than to exclude "an abnormality manifested only by repeated criminal or otherwise anti-social conduct," and to include "congenital and traumatic mental conditions as well as disease." 13 V.S.A. § 4801(a)(2). Nevertheless, we have long held that, while voluntary intoxication may mitigate the crime charged, it will not operate as a total bar to criminal responsibility. *Wheelock*, 158 Vt. at 309, 609 A.2d at 976. This is the rule nationally as well. See P. Hassman, Annotation, *Effect of Voluntary Drug Intoxication Upon Criminal Responsibility*, 73 A.L.R.3d 98, 121 (1976) ("[I]t is generally accepted that voluntary drug intoxication may not be used to completely excuse one from criminal responsibility.").

¶ 21. While the mental state resulting from extreme intoxication may in some cases be "tantamount to insanity," L. Tiffany, *The Drunk, the Insane, and the Criminal Courts: Deciding What to Make of Self-Induced Insanity*, 69 Wash. U. L.Q. 221, 222 (1991), its origin as a self-induced impairment fundamentally distinguishes it for most courts from a naturally occurring mental disease or defect that leads to insanity. See J. Dressler, Understanding Criminal Law § 24.05[A], at 328-29 (3d ed. 2001). Indeed, it is universally recognized that a condition of insanity brought about by an individual's voluntary use of alcohol or drugs will not relieve the actor of criminal responsibility for his or her acts. See W. LaFave, Criminal Law § 9.5(h), at 481-82 (4th ed. 2003).

¶ 22. The only generally recognized exception to this rule is the doctrine known as "fixed" or "settled" insanity.[5] Nearly every court and commentator that has addressed this doctrine has defined it as a permanent or chronic mental disorder caused by the habitual and long-term abuse of drugs or alcohol. See, e.g., A. Levine, Note, *Denying the Settled Insanity Defense: Another Necessary Step in Dealing with Drug and Alcohol Abuse*, 78 B.U. L. Rev. 75, 78 (1998) ("The long-term, consistent abuse of drugs or alcohol may result in permanent mental disorders that are symptomatically and organically similar to mental disorders caused by brain disease. Courts have labeled this condition as 'fixed' or 'settled' insanity, because the disorder remains even though the defendant is not under the influence of the intoxicants."); Tiffany, *supra*, at 225 ("the courts will recognize even a 'voluntarily contracted madness' as insanity if it has become permanent as in the case of 'fixed' or 'settled' insanity, even though it has its origins in alcohol or other drug abuse"); J. Dressler, *supra*, § 24.05[B], at 329 ("Habitual use of intoxicants can result in permanent brain damage, resulting in a substance-induced mental disorder that persists, i.e., the disorder remains even when the actor is not under the influence of intoxicants."); *People v. Whitehead*, 525 N.E.2d 1084, 1087 (Ill. App. Ct. 1988) (insanity defense resulting from drug use is not available "absent a mental defect or disease traceable to chronic or habitual drug use and resulting in a permanent kind of insanity"); see generally R.W. Gascoyne, Annotation, *Modern Status of the Rules as to Voluntary Intoxication as Defense to Criminal Charge*, 8 A.L.R.3d 1236 (1966) (collecting cases).

¶ 23. Scholars have traced the origins of the settled insanity defense in this country to the mid-nineteenth century when courts first considered the culpability of chronic alcoholics for crimes committed in the throes of acute alcohol-induced psychoses, typically marked by hallucinations and paranoid delusions. See generally Levine, *supra*, at 87 (noting that "[a] Tennessee state court first recognized the rarely invoked doctrine of settled insanity in 1850"); Note, *Intoxication as a Criminal Defense*, 55 Colum. L. Rev. 1210, 1219 n.66 (1955) (citing

---

[5] Although, as discussed *infra*, ¶¶ 30-35, the trial court's proposed instruction appears to reject the traditional settled insanity doctrine in favor of a variation adopted in Massachusetts, we consider both doctrines since they are closely related and have been briefed by the parties.

early decisions that recognized settled insanity defense in cases of "delirium tremens . . . a phenomenon brought about by alcoholic abuse over many years — 6 to 10 years of heavy drinking"); Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 153 (4th ed. 1994) (observing that "Substance-Induced Persisting Dementia" generally originates from "a pattern of prolonged and heavy substance use" with symptoms that "persist long after use of the substance has stopped," and is generally characterized by "an insidious onset and slow progression" so that it is "rarely" seen in persons under 20).[6]

¶ 24. From its inception to the present, the settled insanity doctrine has been consistently characterized as a state of mind resulting from "long-continued," "habitual," "prolonged," or "chronic" alcohol or drug abuse leading to a more or less permanent or "fixed" state of insanity. For an illustrative sample of older decisions, see, e.g., *People v. Travers*, 26 P. 88, 91 (Cal. 1891) ("[S]ettled insanity produced by a long-continued intoxication, affects responsibility in the same way as insanity produced by any other cause."); *Fisher v. State*, 64 Ind. 435, 440 (1878) (recognizing settled insanity defense "where the habit of intoxication, though voluntary, has been long continued, and has produced disease, which has perverted or destroyed the mental faculties of the accused"); *State v. Riley*, 13 S.W. 1063, 1064 (Mo. 1890) (holding that "long-continued habits of intemperance, producing permanent mental disease amounting to insanity" may relieve defendant of criminal responsibility); *Cheadle v. State*, 149 P. 919, 922 (Okla. Crim. App. 1915) (recognizing settled insanity due to "excessive and

---

[6] Historians have noted the extraordinary amount of alcohol, particularly distilled liquors then known as "spirits," that Americans consumed during the first half of the nineteenth century. See W. Rorabaugh, *The Alcoholic Republic: An American Tradition* 7 (1979) (noting the "consensus" of early nineteenth century observers that Americans drank "great quantities" of distilled liquors such as whisky, rum, gin, and brandy, often throughout the day). Rorabaugh concludes that "[d]uring the first third of the nineteenth century the typical American drank more distilled liquor than at any other time in our history." *Id.* It is this historical context that helps to explain the origins of the settled insanity doctrine, and the true nature of the condition of the individuals to which it applied. See, e.g., *Beasley v. State*, 50 Ala. 149, 151 (1874) (holding that it was error to fail to instruct on settled insanity where evidence showed that "for several years before the killing, the accused was 'a great drunkard;' that he was 'generally drunk;' his habits were 'to drink from a half to one gallon of spirits every night, and large quantities before breakfast, and before dinner, and before supper each day;'" that several weeks before the killing "he had an attack of *delirium tremens;*" and that shortly before the murder he suffered delusions of "seeing witches and devils.").

long-continued indulgence in alcoholic liquors, technically called, 'delirium tremens'"); *State v. Kidwell*, 59 S.E. 494, 495 (W. Va. 1907) (recognizing defense of settled insanity "superinduced by habitual and long continued intoxication"). For more recent cases illustrating the same principle, see, e.g., *Evans v. State*, 645 P.2d 155, 158 (Alaska 1982) (recognizing insanity defense for "alcoholic psychosis such as delirium tremens, resulting from long-continued habits of excessive drinking"); *Kiley v. State*, 860 So. 2d 509, 511 n.3 (Fla. Dist. Ct. App. 2003) ("[T]he defendant must show that his *long term* and continued use of intoxicants produced a fixed and settled frenzy or insanity either permanent or intermittent.") (quotation omitted); *State v. Clokey*, 364 P.2d 159, 164 (Idaho 1961) (upholding instruction defining settled insanity as "produced by long continued intoxication"); *State v. Smith*, 490 P.2d 1262, 1264 (Or. 1971) (recognizing insanity defense where "excessive and long-continued use of intoxicants produces a mental condition of insanity, permanent or intermittent") (quotations omitted); *Herbin v. Commonwealth*, 503 S.E.2d 226, 231 (Va. Ct. App. 1998) (recognizing settled insanity resulting from "long-term and severe drug abuse").

¶ 25. The underlying rationale for the settled insanity doctrine is generally explained as an acknowledgment of "the futility of punishment, since the defective mental state is permanent," Tiffany, *supra*, at 225 n.16, or, more commonly, as a compassionate concession that at some point a person's earlier voluntary decisions become so temporally and "morally remote" that the cause of the offense can reasonably be ascribed to the resulting insanity rather than the use of intoxicants. Dressler, *supra*, § 24.05[B], at 330; see also Note, *Settled Insanity is Not a Defense: Has the Colorado Supreme Court Gone Crazy? Bieber v. People*, 43 U. Kan. L. Rev. 259, 270 (1994) ("Proponents of a settled insanity defense believe the initial choice to use drugs to be too remote in time to hold a person accountable for it once that person eventually suffers a drug-induced brain disorder."). As the celebrated American jurist and scholar Joseph Story, in one of the earliest reported cases on the subject, observed: "[T]he question made at the bar is, whether insanity, *whose remote cause is habitual drunkenness*, is, or is not, an excuse in a court of law for a homicide committed by the party, while so insane, but not at the time intoxicated or under the influence of liquor." *United States v. Drew*, 25 F. Cas. 913 (D. Mass. 1828) (No. 14,993) (emphasis added); see also *State v. Stark*, 32 S.C.L. (1 Strob.) 479 (S.C. Ct. App. 1847) (acknowledging that insanity defense may lie where de-

fendant's alcoholic psychosis was "a remote consequence superinduced by the antecedent exhaustion of the party arising from gross and habitual drunkenness").[7]

¶ 26. Although, with one exception, every state court to consider the issue has recognized the doctrine of settled insanity, many states — including Vermont — have simply not addressed it. See Levine, *supra*, at 87-88 (noting that twenty-nine states have recognized settled insanity while twenty have not addressed it); cf. *Bieber*, 856 P.2d at 817 (rejecting settled insanity as an unprincipled departure from the general rule precluding the insanity defense where defendant's psychotic state results from voluntary intoxication).[8] Defendant tenders this as an appropriate case in which to recognize the doctrine, noting its general acceptance in other states, longevity under the common law, and recognition by the drafters of the Model Penal Code.[9]

---

[7] The doctrine is not without its more contemporary critics. The author of one seminal article has opined that "the moral culpability of long term alcohol abuse and society's interest in preventing criminal behavior weigh heavily in favor of denying the settled insanity defense." Levine, *supra*, at 101. Another commentator has noted the "injustice" and social costs of holding an intoxicated defendant responsible for his conduct while excusing another merely because he used enough drugs long enough to develop an underlying illness. Note, *Settled Insanity is Not a Defense, supra*, at 270. At least one court has rejected the doctrine as based on an indefensible distinction between the person who drinks or takes drugs and is "momentarily 'mentally defective'" and the person who drinks or takes drugs and is "'mentally defective' as an eventual, long-term result." *Bieber v. People*, 856 P.2d 811, 816 (Colo. 1993).

[8] Although it was not at issue, an instruction to the effect that "in the eye of the law a person in the paroxysms of *delirium tremens* was insane" was apparently given by the trial court in the early case of *State v. Tatro*, 50 Vt. 483, 486 (1878), based on a claim that the defendant was "laboring under the effects of the long-continued use of intoxicating liquor." *Id.* at 485.

[9] The commentary to MPC § 2.08, which deals with intoxication rather than insanity, and which has not been adopted in Vermont, provides:

Under the Model Code as under existing law, it is immaterial that mental disease excluding responsibility was caused by excessive drinking and in that sense is attributable to the defendant. This sort of disease, generally delirium tremens, is said to be "fixed" or "settled." The same treatment is proposed for those periods of temporary disorientation (in alcoholic psychosis) that can occur after a long drinking bout. The Model Code permits such cases to be dealt with under Section 4.01, and nothing in the formulation here undertakes to influence the resolution of the issue whether serious temporary disorientation from realty following intoxication constitutes "mental disease" within the meaning of that section.

Model Penal Code § 2.08, cmt. 2 at 362-63.

¶ 27. We are not persuaded, however, that this appeal presents a suitable factual setting for resolution of the issue. The many cases and articles that consistently require a showing that defendant's mental illness resulted from *"long-term," "habitual,"* or *"chronic"* drug or alcohol abuse do not, of course, establish any specific time frames relative to the offense, nor is it possible to do so. Yet, by any measure, the circumstances here do not begin to approach the *prolonged* abuse leading to a fixed insanity that the common law recognized as sufficiently attenuated to excuse. the crime. Whatever its merits, the doctrine of settled insanity was developed to address mental illness resulting from long-term substance abuse over many years, gradually leading to organic brain damage, and its justification is based on the humane recognition "that at some point a person's earlier voluntary decisions become morally remote." J. Dressler, *supra,* § 24.05[B], at 330.

¶ 28. By his own admission, defendant's LSD use here began in July 2000, lasted about two months, and ended two to three weeks before the offense in late September 2000. He took the drugs precisely to experience the perceptual distortions that may result from such hallucinogens, and fully expected that the drugs would alter his state of mind.[10] Although he continued to have bizarre thoughts weeks and months after the offense, he was found to have returned to mental competence to speak with the police and stand trial for his offenses within weeks, if not days, after the murder.[11]

---

[10] From his interviews with defendant and others, Dr. Linder observed that defendant was an "experimenter scientist type" who used LSD out of "an intellectual curiosity" in order to experience changes in his sensory perceptions. Dr. Linder acknowledged that defendant was aware of, and expected, that the drug would alter his state of mind; he was allegedly unaware of the "degree" to which it would affect his perceptions.

[11] A mental health evaluation of defendant the day after the crime conducted by a psychiatrist at the Vermont State Hospital reported "no abnormalities of thought processes, his thoughts were logical and coherent." Defendant was responsive to questioning, his recent and long-term memory were intact, and although he appeared "hypomanic" (agitated) it was "without psychotic features." Indeed, in ruling on a motion to suppress defendant's statements made to the police hours after the incident, the trial court found that defendant was sufficiently in touch with reality to knowingly and voluntarily waive his *Miranda* rights. Further, Dr. Linder conducted a series of interviews with defendant, beginning on September 29, 2000, two days after the incident, and continuing through mid-November 2000. Dr. Linder's summary and

■ ¶ 29. In these circumstances, the claim that defendant was operating under a "fixed or settled" insanity at the time of the offense is contrary to the very meaning of the doctrine and its altruistic origins. To retain any moral or legal salience, the doctrine must — if it is ever justified — be limited to those cases where the initial choice to abuse alcohol or drugs has become so attenuated over time that it serves little or no purpose to hold the defendant accountable for that choice once a permanent mental illness has taken hold through years of chronic substance abuse. To apply the doctrine here, to a crime committed while defendant was either directly under the influence or in the immediate aftermath of a discrete two-month period of using hallucinogenic drugs, would defeat the doctrine's meaning and underlying purposes. See *Allen v. State*, 539 So. 2d 1124, 1126 (Ala. Crim. App. 1988) (although defendant had been treated for alcohol abuse on two occasions prior to offense, court held that defendant had "produced no evidence that his long-continued alcohol indulgence had resulted in a mental disease or defect"); *State v. Valenzuela*, 559 P.2d 201, 204 (Ariz. Ct. App. 1977) (upholding trial court's refusal to instruct on settled insanity where there was "no evidence to support a finding that the appellant was suffering from an existing state of mental illness caused by prolonged use of liquor"); *People v. Free*, 447 N.E.2d 218, 232 (Ill. 1983) (upholding court's refusal to instruct on settled insanity where there was "no evidence in the record that this defendant was a habitual or chronic user of drugs or alcohol, or that the claimed disease or defect was 'settled' or 'fixed'"). While there may indeed be cases that raise a genuine factual issue as to whether a defendant's prior, long-term drug or alcohol abuse has resulted in a fixed insanity, this is not such a case.[12]

---

report of the interviews indicates that defendant was able to clearly recount the events leading up to the murder, and to recall many of his school and social experiences. Although defendant continued to express certain bizarre thoughts during these interviews, Dr. Linder pronounced him competent to stand trial as of November 16, 2000. In subsequent hospitalization proceedings, the court found that defendant remained competent to stand trial, was able to function adequately most of the time, and was not taking any anti-psychotic medications.

[12] We recognize that the settled-insanity cases are not entirely uniform in their approach to the required duration of the defendant's mental illness before or after the offense. The dissent relies, in particular, on four cases with some similarities to the facts here. In an often-cited decision, *People v. Kelly*, 516 P.2d 875, 877 (Cal. 1973), the California Supreme Court applied the doctrine to a defendant who had used LSD and mescaline "in the months leading up to the offense," and who remained psychotic

¶ 30. Our conclusion applies with equal force to the alternative settled-insanity theory advanced by the trial court in the proposed instruction at issue here. As noted, Dr. Linder offered two possible diagnoses of defendant's psychosis at the time of the offense. The first posited that it was a straight substance-induced psychosis, based on his testimony that LSD may continue to affect the user weeks after its last ingestion. The second was that the LSD triggered a latent mental disease or defect, causing the psychotic episode.[13] The latter diagnosis differs somewhat from the classic etiology of settled insanity because the theory is not that the illegal drugs caused the illness and resulting

for several months after the drugs had worn off. In *Porreca v. State*, 433 A.2d 1204, 1208 (Md. Ct. Spec. App. 1981), the court held that a defendant in a PCP-induced psychosis that lasted three to six months after the offense could invoke the doctrine. In *State v. Maik*, 287 A.2d 715, 721-22 (N.J. 1972), the court held that a defendant who had killed an acquaintance in a psychotic state two months after ingesting LSD was entitled to an insanity defense. And in *People v. Conrad*, 385 N.W.2d 277, 280-81 (Mich. Ct. App. 1986), the court held that a defendant who had used PCP four or five times during the two weeks preceding the murder, and whose psychotic symptoms lasted for several months thereafter, was entitled to invoke the defense. We are not persuaded that these decisions compel a different result here. First, we note that in *Kelly* there was evidence that the defendant had used drugs for three years before the offense, 516 P.2d at 876-77, while in *Porreca* the evidence showed that the defendant had abused drugs for two years, including PCP "with some regularity," 433 A.2d at 1206, and in *Maik* there was no evidence that the defendant's "schizophrenic break" was due to his LSD use, as opposed to depression resulting from a failed romantic relationship, 287 A.2d at 719. Second, while we question whether these decisions are consistent with the uniformly held requirement of a "permanent" or chronic mental illness, we base our holding on the absence of any evidence that defendant here had developed a fixed insanity through long-term substance abuse. Finally, to the extent these decisions hold otherwise, we simply do not agree that the settled insanity doctrine has any application to a defendant who intentionally ingests a mind-altering substance for a period of about two months, and commits an offense shortly thereafter during a psychotic episode that would not have occurred but for the drugs.

[13] Dr. Linder stated that defendant's reaction "was that seen rarely and more commonly manifested, when it does occur, in individuals vulnerable and genetically predisposed where the toxic effects of LSD interact with premorbid vulnerability to produce a sustained psychotic reaction." (Internal quotation omitted.) Dr. Lukas similarly explained that studies had shown that persons with a "genetic predisposition to schizophrenia," or "premorbid" (undiagnosed) schizophrenic disorders "may experience pathological behavior that is temporally related to drug use," and that defendant's "mental health history clearly puts him in this category."

psychosis, but rather that they exacerbated or activated a preexisting latent illness.

¶ 31. Accepting this theory as a plausible basis for the insanity defense, the trial court crafted an instruction that attempted to articulate its essential elements. Borrowing from a Massachusetts decision, *Commonwealth v. Herd*, 604 N.E.2d 1294, 1298 (Mass. 1992), the proposed instruction provides that an insanity defense may be predicated upon a mental condition "caused by the voluntary consumption of illegal drugs if the drugs activate a latent mental disease or defect," provided that the defendant did not know or have reason to know the drug would activate the illness; that the resulting disease is recognized medically and existed at the time of the offense "independent of any temporary intoxication or high that the drugs caused"; and that the mental disease "lasted for a substantial time after the drugs had worn off." The instruction went on to reject settled insanity in its traditional form, stating that "[a] mental disease or defect cannot be caused solely by the consumption of an illegal drug."

¶ 32. Although the *Herd* case actually involved facts closer to a true settled-insanity claim (the evidence showed that the "mental disease or defect [was] caused solely by the consumption of a drug," *id.* at 1299), it relied on two earlier decisions, *Commonwealth v. Shelley*, 409 N.E.2d 732, 738-39 (Mass. 1980), and *Commonwealth v. Brennan*, 504 N.E.2d 612, 616 (Mass. 1987), which held that a defendant may be entitled to show a lack of criminal responsibility where illegal drugs or alcohol activate a latent disease or defect, resulting in a psychotic episode. Defendant has not shown, nor have we discovered, any significant movement by jurisdictions outside of Massachusetts to apply the *Herd* formula.

¶ 33. The proposed instruction essentially posits that when the voluntary use of illegal drugs activates a "latent" mental illness resulting in psychosis, we should ignore the fact that illegal drugs were the precipitating cause. This conclusion runs counter to the fundamental principle that a defendant is not excused from criminal liability for acts which result from a mental state that is self-induced through the voluntary ingestion of illegal drugs or alcohol. If defendant here suffered, as Dr. Linder asserts, from a latent mental illness, it does not alter the fact that, as Dr. Linder also explained, defendant would not have been in a psychotic state at the time of the offense had he not

chosen to use illegal consciousness-altering drugs.[14] Thus, the very evidence on which defendant relies defeats his claim, for it demonstrates that his recent, voluntary use of illegal drugs was an essential causal element of the mental illness and psychotic episode that followed. On these facts, defendant was not entitled to assert an insanity defense. See, e.g., *Commonwealth v. Henry*, 569 A.2d 929, 935 (Pa. 1990) (rejecting defendant's claim that the trial court erred in precluding an insanity defense based on his theory that he suffered from "an inherent pathologic illness triggered by the voluntary ingestion of alcohol"); *Evilsizer v. State*, 487 S.W.2d 113, 115 (Tex. Crim. App. 1972) (rejecting proposed instruction that would have allowed finding of insanity where "the accused is in any degree mentally impaired or infirm, and such impairment or infirm condition of his mind was stimulated or aggravated by the use of intoxicants to such an extent as to cause the accused to become temporarily insane").

¶ 34. Our conclusion is not altered by the instruction's additional requirement that defendant neither "knew nor had reason to know that the drug would activate the illness." As we have seen, it is a fundamental tenet of our criminal code that a defendant must be held accountable for the consequences of his or her actions resulting from the voluntary ingestion of illegal drugs or alcohol, and this rule remains unaffected by the possibility that the substance will activate an unknown condition leading to an unexpected reaction. See, e.g., *State v. Sette*, 611 A.2d 1129, 1136 (N.J. Super. Ct. App. Div. 1992) (rejecting defendant's claim that he lacked criminal responsibility where his drug use interacted with the unknown presence in his system of agricultural pesticides, resulting in a psychotic reaction "wholly out of line with his reasonable expectations"). Indeed, many courts have held that a defendant can not reasonably assume the use of illegal drugs will have any predictable

---

[14] In his final report to the court, Dr. Linder stated that absent defendant's latent predisposition, his drug use probably would not have resulted in a psychotic reaction, and, equally, that *but for* the drug use, the latent condition probably would not have produced a psychotic reaction at the time of the offense. As he explained: "Without the predisposing elements of his susceptibility, the drug use alone would have probably not led to the resulting psychotic condition. Without the drug use, in an individual susceptible to decompensation as was Mr. Sexton, the deterioration probably would not have occurred within the same time frame and it may have been avoided altogether due to other interceding circumstances." At his deposition, Dr. Linder again agreed that, "but for the drugs" that defendant had consumed, he probably would not have become psychotic.

54

effect. See, e.g., *People v. Velez*, 221 Cal. Rptr. 631, 638 (Ct. App. 1985) (rejecting claim that defendant was not responsible for his actions after smoking marijuana cigarette unaware that it was laced with PCP since he could not "assume" that the marijuana would "produce any predictable intoxicating effect"); *State v. Hall*, 214 N.W.2d 205, 208 (Iowa 1974) (holding that defendant could not avail himself of involuntary intoxication defense where he claimed ignorance that the pill he took was LSD but otherwise "knew it was a mind-affecting drug"); *Commonwealth v. Campbell*, 284 A.2d 798, 801 (Pa. 1971) (observing that the "nonpredictability" of hallucinogenic drugs such as LSD militates against recognizing a defense based on the psychotic state of mind which they induce).[15]

¶ 35. In response to the third question, therefore, we hold that the proposed instruction did not set forth a correct statement of the insanity defense under 13 V.S.A. § 4801. We recognize that mental disease and the abuse of illegal drugs often coexist, and emphasize that nothing in our holding bars an insanity defense where the prior use of drugs is not an essential causal element of defendant's mental state. Indeed, nothing that we have said would preclude this or any other defendant from attempting to prove at trial that the alleged insanity at the time of the offense was caused by a mental disease or defect that rendered them incapable of appreciating the criminality of their acts or of conforming their conduct to the requirements of law. Upon such a showing, however, the State may offer evidence to prove that the voluntary ingestion of intoxicants was an essential causal element of the insanity so as to refute the claim that the insanity absolves the defendant of criminal responsibility. See *State v. Hanson*, 529 A.2d 720, 724 (Conn. App. Ct. 1987) (where defendant has claimed affirmative defense of insanity, "[t]he state may offer evidence that intoxicating liquor was voluntarily ingested so as to cause the disease or defect, to refute the evidence that insanity absolves the defendant of criminal responsibility").

---

[15] Contrary to the assertion of our dissenting colleague, it is of no moment that the defendants in these decisions remained under the influence of drugs or alcohol at the time of the offense while defendant here may not have been under the immediate influence of LSD. Even if it was the "latent" illness from which defendant's psychosis emerged, that illness was allegedly activated by defendant's two-month use of drugs, and he therefore remains liable for its consequences, anticipated or not (at least in the absence of evidence of a fixed insanity resulting from long-term substance abuse).

¶ 36. Finally, we note that defendant has not asserted a constitutional right to an insanity defense based on the theory that we have rejected today, and we are reluctant to delve at length into a subject that was not raised below or briefed and argued on appeal. As there is little point, however, to issuing a decision of doubtful constitutional validity, we pause long enough to note the following: The United States Supreme Court has held that there is no due process right to assert a defense of voluntary intoxication so as to mitigate or excuse a charge of murder, *Montana v. Egelhoff*, 518 U.S. 37, 56 (1996) (Scalia, J., plurality opinion), and we are confident, in light of this holding, that the Court would not find a fundamental right to assert a complete defense based on the voluntary consumption of illegal drugs. Indeed, the high court has traditionally reserved to the states the task of balancing the "constantly shifting ... religious, moral, philosophical, and medical views" that underlie the insanity defense, *Powell v. Texas*, 392 U.S. 514, 536 (1968), and has expressly "not said that the Constitution requires the States to recognize the insanity defense." *Medina v. California*, 505 U.S. 437, 449 (1992). Four state courts have thus upheld legislation virtually abolishing insanity as a defense and allowing evidence of mental disease or defect solely to rebut the mens rea element of the charge. See *State v. Searcy*, 798 P.2d 914, 919 (Idaho 1990); *State v. Bethel*, 66 P.3d 840, 851-52 (Kan. 2003); *State v. Korell*, 690 P.2d 992, 998-1000 (Mont. 1984); *State v. Herrera*, 895 P.2d 359, 366 (Utah 1995). Therefore, while we need not consider the constitutional dimensions — if any — of our decision, we issue it secure in the understanding that it violates no fundamental rights of defendant.

¶ 37. Our dissenting colleague rather strenuously asserts six purported deficiencies in today's decision. We address them in order. First, it is asserted that we improperly characterize the case as turning on "intoxication" rather than "accept the reality" that it involves insanity. *Post*, ¶ 47. On the contrary, the reality here is that defendant has asserted a defense premised on the proposition that his voluntary use of hallucinogenic drugs within weeks of the offense may entirely excuse his actions. While defendant may not have been in the immediate throes of an hallucinogenic "high," the proximity and short-term nature of his drug use certainly bars any legitimate claim to a settled insanity defense.

¶ 38. Next, the dissent claims that the Court's decision fails to answer the actual question posed, and instead holds that "defendant should not be able to raise an insanity defense under any circum-

stances." *Post*, ¶ 49. We do not believe that anyone reading today's decision will be left uncertain as to the Court's answer to the specific question certified for review. As stated earlier, in response to that question, we hold that defendant may not assert an insanity defense premised on the voluntary use of illegal drugs that triggers a latent mental disease or defect.

¶ 39. As to the dissent's charge that today's decision precludes defendant from raising an insanity defense "under any circumstances," even a cursory review of the opinion demonstrates otherwise. The argument appears to be premised on dissatisfaction with the rule barring a claim of insanity if it would not have occurred "but for" the defendant's voluntary use of illegal drugs. The dissent claims that this will unfairly prevent many mentally ill persons from presenting a legitimate insanity defense. We discern no basis for such a claim, however, and the dissent offers none. "But for" causation is a familiar legal standard that other jurisdictions have utilized in this context. See, e.g., *United States v. Henderson*, 680 F.2d 659, 662 (9th Cir. 1982) (noting that insanity defense resulting from combination of mental defect and alcohol is unavailable where "absent the alcohol [the] mental defect would not have rendered [the defendant] insane"); *Hanson*, 529 A.2d at 723 (upholding trial court's rejection of insanity defense where evidence did not establish "that it was the defendant's mental condition, absent the ingestion of alcohol, which was the cause of his criminal behavior"); *State v. Flagg*, No. 9804019233, 1999 WL 167775, at *2 (Del. Super. Ct. March 10, 1999) (interpreting state statute to hold that where alleged insanity "would not have occurred but for such [drug] consumption, . . . defendant could not present an insanity defense"); see also Conn. Gen. Stat. § 53a-13(b) (2001) ("It shall not be a defense under this section if such mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance . . . ."); Del. Code Ann., tit. 11, § 401(c) (2001) ("It shall not be a defense . . . if the alleged insanity or mental illness was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor, any drug or other mentally debilitating substance . . . ."); Wash. Rev. Code § 10.77.030(3) (2002) ("No condition of mind proximately induced by the voluntary act of a person charged with a crime shall constitute insanity"). The "but for" standard most effectively advances the underlying principle that a person who would not have been insane at the time of the offense *but for* the use of illegal drugs should not be excused of responsibility for the crime. As we have emphasized, however, nothing in our decision forecloses defendants

from claiming or demonstrating that, apart from any incidental drug use, they suffered from a mental disease or defect that rendered them incapable of appreciating the criminality of their acts or conforming their conduct to the requirements of the law.

¶ 40. Next, the dissent claims that the Court has "ignored" the relevant standard of review and "selectively" found facts to support its decision. *Post*, ¶ 51. On the contrary, the material facts underlying today's decision are virtually undisputed, and consist entirely of the evidence advanced *by defendant* (not the State or this Court) in support of his claim. Defendant claims, without dispute, that he consumed large quantities of LSD for about two months during the summer preceding the offense, and stopped about two to three weeks before the attack in September 2000. Assuming these facts to be true, we hold plainly and simply that they are legally insufficient to support a claim of insanity. See *State v. Cram*, 157 Vt. 466, 469, 600 A.2d 733, 734 (1991) (where the facts asserted by defendant, taken as true, are insufficient to sustain the purported defense, the trial court should deny use of the defense).

¶ 41. The dissent's recurring claim that the Court ignores or prejudges the record evidence is unfounded. We are well aware of the record evidence of defendant's troubled family history, of the possibility that defendant suffered from some mental illness prior to the assault of the victim in this case, and of the potential that he may experience cyclical periods of mental illness in the future. As we have stated, defendant is not barred from asserting an insanity defense on this basis. He is barred, however, from claiming a mental illness triggered by the use of illegal drugs.[16]

¶ 42. Next, the dissent claims that our holding is unprecedented in its restrictions on the insanity defense, contrary to the common law, and constitutes an unwarranted intrusion on the prerogatives of the Legislature. Nothing could be further from the truth. Indeed, as we have seen, to recognize a settled insanity defense in this case would represent a distinct departure from the basic common-law doctrine requiring a fixed mental infirmity resulting from chronic substance abuse over the course of many years. As for the variant set forth in the

---

[16] Although the dissent criticizes our holding for being limited to the use of "illegal" drugs that trigger a latent mental illness, *post*, ¶ 67 n.18, that is the precise language used by the trial court in the proposed instruction, and the issue that we certified for review.

trial court's proposed instruction, which the dissent has aptly labeled the "Massachusetts defense," *post*, ¶ 87, we are aware of no widespread endorsement of this approach. With respect to the dissent's claim that our holding impermissibly amends the insanity statute, which contains no express exception for insanity caused by drugs or alcohol, we would point out that the argument is fundamentally self-defeating; it acknowledges that in the absence of an express statutory provision, the common law controls. See *State v. Francis*, 151 Vt. 296, 305, 561 A.2d 392, 397 (1989) ("[T]he common law controls unless modified by statute or case law.") (quotations omitted). As we have seen, it is well settled that, absent a fixed insanity developed over a prolonged period of abuse, the voluntary use of drugs or alcohol that triggers a psychotic reaction will not absolve a defendant of criminal responsibility. Our holding, therefore, is consistent with controlling common law, and does no violence to the separation of powers doctrine or the prerogatives of the Legislature.

¶ 43. Finally, the dissent claims that the "moral blameworthiness" rationale for barring an insanity defense based upon the recent, voluntary use of illegal drugs is "suspect" here because the taking of drugs may not have been "entirely voluntary." *Post*, ¶¶ 66-67. In fact, however, defendant did not claim below, and does not argue here, that his consumption of illegal psychoactive drugs was involuntary. Rather, defendant has consistently maintained that the insanity defense should be available notwithstanding his voluntary use of illegal drugs if the drugs resulted in a settled insanity or interacted with a preexisting mental condition to cause insanity. Defendant's implicit concession is consistent with Dr. Linder's report, based on interviews with defendant and others, which indicates that defendant had been consciously experimenting with the mind-altering effects of illegal drugs out of "intellectual curiosity." Accordingly, the dissent's argument is simply irrelevant to this case. Furthermore, although the dissent cites articles suggesting a causal connection between mental illness and compulsive drug or alcohol use, most courts have rejected the proposition that mental illness that predisposes a defendant to drug or alcohol abuse may justify a finding of involuntary intoxication. See, e.g., *Evans*, 645 P.2d at 159-60 (rejecting claim that an internal compulsion to drink may support involuntary intoxication or insanity defense); *See v. State*, 757 S.W.2d 947, 950 (Ark. 1988) (noting that "most jurisdictions have held that an irresistible compulsion to consume intoxicants caused by a physiological or psychological disability does not render the ensuing intoxication involuntary"); *State v. Palacio*, 559 P.2d 804, 806 (Kan.

1977) (rejecting claim that compulsion to drink rendered defendant's intoxication involuntary); *State v. Bishop*, 632 S.W.2d 255, 259-60 (Mo. 1982) (rejecting argument that drugged condition of defendant was involuntarily produced where it was caused by defendant's addiction); see generally Dressler, *supra*, § 24.02[A][2], at 321-22.

## III.

¶ 44. The fundamental principle underlying the insanity defense is that one should not be punished for criminal acts for which one is not responsible. Consistent with this principle, it is universally recognized that a defendant who intentionally consumes drugs or alcohol resulting in a psychotic state will not be relieved of responsibility for his or her criminal acts. The question presented by this case is whether we are willing to relieve a defendant of criminal responsibility whose psychosis allegedly emerged from a mental illness triggered by the defendant's voluntary use of illegal hallucinogenic drugs for a period of two months preceding the crime. As explained above, we conclude that the law may *reduce* an individual's culpability in such circumstances, but will not *excuse* it. Like any other individual asserting an insanity defense, however, defendant remains free to prove that he was not responsible for his conduct as the result of an independently preexisting mental disease or defect that rendered him unable to appreciate the criminality of his acts or to conform his conduct to the requirements of law.

*The trial court order denying the State's motion to preclude evidence at trial regarding defendant's diminished capacity due to voluntary use of illegal drugs is affirmed. The trial court order allowing defendant to present an insanity defense based on the voluntary consumption of illegal drugs that activate a latent mental disease or defect is reversed. The case is remanded for further proceedings consistent with the views expressed herein.*

¶ 45. **Dooley, J.,** dissenting. Although I concur with Part I of the majority opinion and join it, I respectfully dissent from Part II. There, the majority holds that a statutory insanity defense is not available to a defendant who is insane at the time of the charged offense as the result of a latent mental illness activated by the defendant's prior ingestion of illegal drugs — even if the defendant's mental condition prevented him from conforming his conduct to the requirements of the law, and even if he did not know, and could not have known, that his drug use would trigger the underlying mental illness. In my view, the holding is

inconsistent with our insanity defense statute, the Model Penal Code from which our statute is derived, and the established common law. Further, the majority's holding fails to answer the certified question before us and is based on appellate fact-finding with no recognition of the limited standard of review applicable here.

¶ 46. I recognize that this is a complex and confusing case, in part because of the complicated expert testimony and in part because of the way the majority has chosen to analyze the case. My goal in this dissent is to provide clarity where it does not exist in the majority opinion. I attempt to do so by expressing up front my six main differences with the majority opinion in general terms in Part I. Then I will review the facts in detail and discuss how I would decide this case, interrelating why I believe the majority's analysis is wrong.

## I.

### A. *This Case is Not About Intoxication.*

¶ 47. This is a recurring theme in my dissent because it is a recurring theme in the majority opinion and the authority on which it relies. Apparently, the majority has succumbed to the State's refrain that defendant is trying to make an insanity defense out of being high on drugs. I emphasize that everyone in this case, *including the defendant*, agrees that the mental state of intoxication alone cannot be a complete defense to a criminal charge. By intoxication, I mean the mind alteration or "high" that directly follows the ingestion of an intoxicant. At best, intoxication can demonstrate diminished capacity, as Part I of the majority opinion holds. The trial court acknowledged as much and more, stating in its proposed summary of Vermont law that the mental disease "must exist at the time of the offense, independent of any temporary intoxication or high that the drugs caused." But faced with expert opinion that defendant's conduct resulted from a preexisting mental illness activated by long-term drug use, the court decided that the causative presence of both the preexisting mental illness and the drug-induced psychotic condition, *independent of any intoxication,* could be found by the jury to be insanity under our statute. Our opinion should accept the reality of the trial court's decision and its support in the evidence, rather than characterize this as an intoxication case.[17]

---

[17] As I discuss below, *infra*, ¶¶ 52-56, the majority's response, *ante*, ¶ 37, is to distort defendant's offer of proof.

B. *The Majority Opinion Answers the Wrong Question.*

¶ 48. As noted in ¶ 9 of the majority opinion, the trial court asked this Court in its third certified question if the following is a correct statement of the law as it relates to the term "mental disease or defect" contained in 13 V.S.A. § 4801:

> The term "mental disease or defect" as used in 13 V.S.A. § 4801 includes a mental condition caused by the voluntary consumption of illegal drugs if the drugs activate a latent mental disease or defect, and as a result of that mental disease or defect the individual has lost capacity to appreciate the criminality of his conduct, or has lost the capacity to conform his conduct to the requirements of the law, unless the individual knew or had reason to know that the drug would activate the illness. The resulting disease or defect must be recognized medically and must exist at the time of the offense, independent of any temporary intoxication or high that the drugs caused. It does not matter that the mental disease or defect was not permanent, if the condition lasted for a substantial time after the intoxicating effects of the illegal drugs had worn off. A mental disease or defect cannot be caused solely by the consumption of an illegal drug.

¶ 49. Instead of directly addressing this question, the majority leads off Part II of its opinion by saying "[t]he final certified question asks us to determine whether defendant can present an insanity defense . . . ." *Ante,* ¶ 18. In the end, the majority never fully answers the question posed but instead delves into the facts to show that defendant should not be able to raise an insanity defense under any circumstances. According to the majority, "the claim that defendant was operating under a 'fixed or settled' insanity at the time of the offense is contrary to the very meaning of the doctrine and its altruistic origins," and applying "the doctrine here, to a crime committed while defendant was either directly under the influence or in the immediate aftermath of a discrete two-month period of using hallucinogenic drugs, would defeat the doctrine's meaning and underlying purpose." *Ante,* ¶ 29.

¶ 50. I recognize that we have "on occasion, deviated from the general rule and decided issues on interlocutory appeal where the trial court had not properly certified the question but where the question is capable of resolution and has been fully briefed and argued." *White*

*Current Corp. v. Vt. Elec. Coop.*, 158 Vt. 216, 222, 609 A.2d 222, 225 (1992). But there is nothing improper about the certified question here. Except for making modifications to accurately state its legal position, the trial court simply posed the question proposed by the prosecution. Nevertheless, the majority ventures into issues that the parties, particularly defendant, have not even briefed. Further, the majority does so without even acknowledging that it has deviated from the certified question.

### C. *The Majority Has Ignored the Standard of Review and Selectively Found Facts to Support Its Conclusion.*

¶ 51. The question in this case is not whether defendant will be found insane — indeed, insanity defenses are notoriously difficult to sustain — but whether the jury will even be allowed to consider an insanity defense. Nowhere in the majority opinion is there an acknowledgment that the standard of review with respect to this question, and particularly with respect to facts surrounding this question, is very limited. The issue is whether defendant made a sufficient offer of proof to reach the jury on whether he was insane at the time of the offense, and the standard we must apply is whether "taking the facts in defendant's offer as true, no reasonable juror could find that the requirements of the [insanity] defense were satisfied." *State v. Cram*, 157 Vt. 466, 469, 600 A.2d 733, 734 (1991) (applying necessity defense); see also *State v. Bush*, 595 S.E.2d 715, 722 (N.C. Ct. App. 2004) (holding that "[i]n determining whether the evidence supports an instruction on any affirmative defense, the evidence should be viewed in the light most favorable to the defendant").

¶ 52. The problem is not the majority's failure to recognize that it is bound by this limiting standard, but rather that it never applies the standard at all. For the most part, the majority opinion is based on its own fact-finding. In some places it relies upon the prosecution's evidence for its facts, ignoring the detailed offer of proof from defendant upon which the trial court ruled and from which we are required to draw the relevant facts. Thus, the majority portrays a defendant who did drugs for a very short period of time, went crazy, killed someone, and then returned to a normal state shortly after the killing.

¶ 53. The majority ignores the ample evidence that is inconsistent with its characterization of the facts. Representative of the majority's approach is the language I quoted above: "defendant was either directly under the influence or in the immediate aftermath of a discrete two-month period of using hallucinogenic drugs." *Ante*, ¶ 29. And in

response to this dissent, the majority says, "[w]hile defendant may not have been in the immediate throes of an hallucinogenic 'high,' the proximity and short-term nature of his drug use certainly bars any legitimate claim to a settled insanity defense." *Ante,* ¶ 37.

¶ 54. Compare the majority's description of the evidence to the description of defendant's mental condition contained in Dr. Linder's report in defendant's offer of proof:

> Mr. Sexton was experiencing significant dysfunction in his life characterized in part by the loss of a girlfriend relationship, being confronted at gunpoint, nuclear family dysfunction, curfew mandated isolation, unemployment, legal difficulties and substance use. It was under the cumulative strain of these circumstances that he decompensated into a florid psychotic condition. His substance use contributed to this destabilization. He had been using cannabis, LSD, some cocaine, some psilocybin mushrooms, some Ketamine, some ecstacy and some nitrous oxide.

Under the majority's analysis of the offer of proof, the only relevant word in the above paragraph is LSD; it is as if the remainder of the words were not there.

¶ 55. Up until the opinion in this case, there has been only one independent judicial analysis of defendant's condition, done by Judge Toor to determine whether a hospitalization hearing was required for defendant. In reaching her decision, she found: (1) defendant's mental condition had been developing for many years; (2) a mental illness such as defendant's is usually a lifelong condition that often requires cyclical hospitalization; (3) defendant is likely to have more overt psychotic conditions at different times in his life; and (4) his condition will wax and wane over time. It is difficult to reconcile Judge Toor's analysis of defendant's condition with that of the majority.

¶ 56. The majority's language in describing defendant's condition and his defense was not chosen to put defendant's circumstances in the best light from his perspective. Indeed, the description is exactly the prosecution's characterization of the evidence when viewed in the light most favorable to the State.

D. *The Majority Has Rejected as Too Liberal a Proposed Instruction that Would Restrict the Availability of an Insanity Defense in Drug Cases to a Greater Extent Than Any Jurisdiction in the United States, Except for a Few States that Have Enacted a Specific Restrictive Statute.*

¶ 57. As discussed in detail below, there are two recognized instances where a defendant who has taken drugs can nevertheless be insane at the time of the criminal act. The first is when the defendant suffers from "fixed" or "settled" insanity as a result of drug usage. The second is when the defendant has a preexisting mental illness and the drug usage activates that mental illness under circumstances where the defendant is unaware that the activation would occur. Uniquely, the trial court required that both instances be present in the same case, a requirement imposed by no other court in the United States. Thus, this defendant was required under the trial court's instruction to prove both that he suffered from fixed or settled insanity as a result of drug use *and* that he had a preexisting separate mental illness that was activated unforeseeably by the drugs. I doubt that more than a small percentage of defendants who had ever taken drugs could fit themselves within the very narrow confines of the insanity defense allowed by the trial court. Indeed, defendant may be in a small class of one in his ability to provide evidence on all the elements.

¶ 58. One would think from the rhetoric of the majority opinion, some of which I quoted above, that the trial court had adopted a very liberal standard out of touch with the vast majority of decisions around the country. It is hard to imagine a characterization further from the truth. The concerns that caused the trial court to create its restrictive standard were much the same as those professed by the majority today, even if its method of addressing them was different. Nowhere is this reflected in the majority opinion.

¶ 59. I return to the point made above that the majority has failed to fully address the certified question. The trial judge believed that a combination of an underlying mental illness, conditions that created fixed and settled insanity, and an unawareness of the effect of the drugs was sufficient to get to the jury with an insanity defense. He apparently agreed with the majority on the weakness of each of the elements of the defense in isolation — for example, he rejected the doctrine of fixed and settled insanity — but believed that a carefully-constructed combination of the elements met all the concerns. The majority has not addressed why his analysis is wrong, instead considering the elements separate from each other. Moreover, it has not addressed why his

instruction on the element taken from fixed and settled insanity is wrong, instead choosing to evade the question and hold without briefing that defendant could not meet any test of fixed and settled insanity.

¶ 60. The majority's holding is that if defendant's drug use was one of the factors leading to the charged offense, he cannot present an insanity defense to the jury *even if he can demonstrate overwhelmingly that the criminal conduct was caused by an independent mental illness*. No court has adopted such a restrictive standard, except when construing statutes that explicitly foreclosed an insanity defense where drugs were a causal factor. In essence, the majority has reduced to zero the very few possible defenses allowed by the trial court's restrictive legal standard.

¶ 61. I recognize that this is a strong statement, but I believe that it is fully supported by the record in this case. Defendant's expert witness gave his opinion that defendant's behavior was caused either by "Schizophreniform Disorder or Substance Induced Psychotic Disorder," either of which is "a severe psychotic condition ... capable of qualifying as a mental disease." The reality is that while he can identify mental illness when he sees it, the expert cannot exclude every possible cause. The burden placed on defendant by the majority is virtually impossible to satisfy because in the complex area of human behavior, defendant cannot prove a negative.

¶ 62. I also stand by my statement about the law in the rest of the country, notwithstanding the majority's citation to a number of cases in support of its position. Even a cursory reading of the cases cited by the majority shows that they involved (1) statutes explicitly foreclosing an insanity defense when drug use is a causal factor and/or (2) offenses committed while the defendants were under the immediate influence of intoxicating drugs or alcohol — precisely what the trial court's instruction excluded from consideration in this case. I particularly take issue with the majority's summary of the law: "As we have seen, it is well settled that, absent a fixed insanity developed over a prolonged period of abuse, the voluntary use of drugs or alcohol that triggers a psychotic reaction will not absolve a defendant of criminal responsibility." *Ante*, ¶ 42. This is not an accurate statement of the common law in situations where the defendant suffered from an underlying mental illness that was a proximate cause of his criminal conduct and he was not under the direct influence of intoxicating drugs at the time of the offense. Nor is it an accurate description of the fixed or settled insanity doctrine as it has

evolved in the common law. And even if it were an accurate statement of the law, defendant's offer of proof is sufficient to get to the jury under that standard.

¶ 63. Although the majority contends that it is just relying on "basic common-law doctrine," *ante*, ¶ 42, it refuses to recognize fixed or settled insanity in any context. Every court that has considered the question, except for one that relied upon a specific statute distinct from ours, has adopted the doctrine of fixed or settled insanity as part of the common law. Yet, the majority strongly indicates that it will never accept fixed or settled insanity, putting it at odds with every other state in the country without a specific statute on the question.

E. *The Majority Has Ignored Vermont's Insanity Statute While Imposing on Vermont the Statutes of Other States.*

¶ 64. Apart from citing it, the majority barely mentions Vermont's insanity defense statute. Yet, this is fundamentally a statutory construction case because the Legislature has taken control of the policy regarding when to allow an insanity defense. A proper analysis of this case under the statute the Legislature has enacted reaches a very different conclusion than that reached by the majority, as discussed in detail below. The majority obviously disagrees, imposing the policy it wants rather than the policy the Legislature enacted. To support its point of view, the majority relies on precedents from states with special statutes governing the interrelationship between drug abuse and insanity. In effect, the majority imposes these special statutes on Vermont, thereby disregarding the policy choices of the Vermont Legislature in favor of those made by the legislatures of Delaware, Washington, and Connecticut.

¶ 65. In my view, the majority's decision goes beyond the proper role of this Court. This case concerns an area of the law that entails "significant and far-reaching policy concerns more properly left to the Legislature, where hearings may be held, data collected, and competing interests heard before a wise decision is reached." *Smith v. Parrott*, 2003 VT 64, ¶ 14, 175 Vt. 375, 833 A.2d 843 (quotations omitted) (holding that where statute incorporated common law elements of medical malpractice, decision to follow other states in adopting "loss of chance" doctrine of causation involves conflicting policy considerations best left to Legislature); accord *Titchenal v. Dexter*, 166 Vt. 373, 385, 693 A.2d 682, 689 (1997) (stating that "complex social and practical ramifications" of recognizing nonparents' right to seek custody or visitation renders Legislature "better equipped to deal with the problem"). As one lead-

ing commentator has stated, the legal standard for presenting an insanity defense

> must reflect underlying principles of criminal responsibility, comport with the current scientific understanding of mental disease, permit mental health experts reasonable opportunity to provide their insights to the court, and yet also preserve to the trier of fact the ultimate and full authority to render a verdict on criminal responsibility.

J. Dressler, Understanding Criminal Law § 25.01, at 336 (3d ed. 2001). Crafting such a standard is a job for the Legislature, not this Court.

### F. *The Majority's Underlying Philosophy of Moral Blameworthiness is Suspect in These Circumstances.*

¶ 66. We are dealing here with the special circumstance of a defendant who, if the court-appointed expert's testimony is accepted, was mentally ill at the time of the offense and whose mental illness caused the criminal conduct. Yet, the majority's holding prevents this mentally ill defendant from even presenting an insanity defense to the jury.

¶ 67. The majority justifies this anomaly by proclaiming that defendant is morally blameworthy for taking drugs.[18] That rationale might be understandable if the taking of drugs was entirely voluntary and not affected by defendant's underlying mental illness. Although no expert addressed this question because it was not relevant to the legal standard, and the majority has now foreclosed that inquiry by its ruling, it is unlikely to be true. The literature is clear that there is a relationship between mental illness and drug abuse. The research indicates "that one's inherent propensity to use drugs or alcohol can be

---

[18] The moral blameworthiness rationale is reinforced by the use of the word "illegal" in every reference to drugs. The choice of phrasing makes unclear whether the majority's holding would also apply to a mentally ill alcohol abuser. The decisions from other states make clear that the common law treats alcohol and drug abusers alike. See J. Dressler, *supra*, § 24.01[A], at 319 ("[T]he law pertaining to intoxication does not distinguish between alcohol and other foreign substances, including prescribed medications and illegal drugs."); *Commonwealth v. Campbell*, 284 A.2d 798, 801 (Pa. 1971) (stating that overwhelming view of courts across country is that "there should be no legal distinction between the voluntary use of drugs and the voluntary use of alcohol in determining criminal responsibility for a homicidal act"). The majority's focus on illegal drug abusers reinforces that it is making a policy judgment that is in the province of the Legislature rather than this Court.

triggered by mental illness," including personality disorders or organic brain disorders such as schizophrenia. M. Sbaiti, *Administrative Oversight? Towards a Meaningful "Materiality" Determination Process for Dual-Diagnosis Claimants Seeking Disability Benefits under Titles II & XVI of the Social Security Act*, 35 Colum. Hum. Rts. L. Rev. 415, 432 (2004); see also R. Honberg, *The Injustice of Imposing Death Sentences on People with Severe Mental Illnesses*, 54 Cath. U. L. Rev. 1153, 1161 (2005) (noting high rates of "comorbidity — co-occurring mental illness and substance use or abuse"); E. Boison, *Mental Health Parity for Children and Adolescents: How Private Insurance Discrimination and ERISA Have Kept American Youth from Getting the Treatment They Need*, 13 Am. U. J. Gender Soc. Pol'y & L. 187, 208 n.154 (2005) (accord).

¶ 68. In view of these research findings, I cannot subscribe to the majority's view that every mentally ill defendant who takes drugs is morally blameworthy for any criminal conduct that occurs.[19] I agree with the Supreme Judicial Court of Massachusetts that the moral fault for using illegal drugs is not equivalent to the moral fault for committing the charged offense, particularly when that offense is murder. See *Commonwealth v. Herd*, 604 N.E.2d 1294, 1299 (Mass. 1992) ("We are unwilling, in order to justify a homicide conviction, to permit the moral fault inherent in the unlawful consumption of drugs to substitute for the moral fault that is absent in one who lacks criminal responsibility."). By denying defendant an opportunity to present an insanity defense because of his prior drug use, the majority undermines one of the most basic precepts of our criminal law, as stated by Justice Frankfurter over fifty years ago:

> Ever since our ancestral common law emerged out of the darkness of its early barbaric days, it has been a postulate of Western civilization that the taking of life by the hand of an insane person is not murder.

*United States ex rel. Smith v. Baldi*, 344 U.S. 561, 570 (1953) (Frankfurter, J., dissenting).

## II.

¶ 69. The majority's selective presentation of certain facts requires that I provide a fuller rendition of the circumstances surrounding the

---

[19] Again, the majority supports its rationale with cases dealing with intoxication, *ante*, ¶ 43, exactly what is not involved in this case.

charged offense in order to address the question certified by the trial court. Defendant was eighteen years old when he committed the offense. His father had a history of recurrent depression, alcohol and substance abuse, suicide attempts, and a personality disorder requiring years of mental health treatment. Defendant's mother also suffered from depression. Other extended family members had had "nervous breakdowns" or had attempted suicide. Early on, defendant was diagnosed with emotional and behavioral disabilities that affected his school work. The diagnoses included adjustment disorder with mixed emotional features, mixed receptive-expressive language disorder, appositional defiant disorder, and acute stress disorder.

¶ 70. By the seventh grade, defendant was exhibiting serious behavioral problems and was smoking marijuana. On separate occasions in 1995, he threatened each of his parents with a knife. Crisis services were called, and defendant was briefly hospitalized, after which he continued for some period of time in outpatient psychotherapy. In 1998, he threatened to kill his father after he was grounded for using the family car. Based on that incident, he was charged with domestic assault and placed on probation.

¶ 71. In the spring of 1999, after another confrontation with his father that resulted in his slitting his own wrist, defendant stopped attending school regularly, left home, and began working full time. His drug use escalated after he lost his job in January 2000. In addition to regular marijuana use, he experimented with other psychoactive drugs such as ecstacy, hallucinogenic mushrooms, and cocaine. In July 2000, he began using LSD. Although he claims to have taken up to 300 "hits" in the ensuing two or three months, at least one of the examining psychiatrists opined that such numbers were unlikely because that amount would have prevented defendant from being able to function at any level. Defendant was arrested twice in August 2000, the month before the killing. The first incident occurred when he engaged police in a physical confrontation after they tried to remove him from a private residence. The second incident occurred a week later when he tried to intervene with police officers who were confronting his friends because of their use of his skateboards. He was charged with impeding an officer, disorderly conduct, and resisting arrest.

¶ 72. By all accounts, defendant last took LSD two to three weeks before the killing. He continued to smoke marijuana on a daily basis until three or four days before, and possibly again on the day of, the killing, but apparently took few, if any, other drugs during that period.

Nevertheless, he began to experience more pronounced feelings of paranoia in the days leading up to the killing. Witnesses described him as constantly discussing conspiracy theories and feeling that everyone was against him. He believed that his friends were trying to pull something out of him and that there was "a society within a society" that did not include him. He felt like everyone was "in his face" and wanted to kill him because they knew what he was thinking, particularly how miserable they all were. He considered them all to be "robots" who could not control themselves.

¶ 73. He ate very little, had difficulty sleeping, and stopped going outside. He believed that he saw blood coming from his cat and that the cat was in pain and asking him to end its misery. On the evening of the killing, he strangled and stomped the cat to death after he thought he heard it say it was suffering. He imagined that, to be reborn, he had to collect souls and become a new deity. Not wanting to look at the mangled cat, he decided to start collecting souls immediately. He headed upstairs to gather the souls of (i.e., kill) his neighbors, but they were not home, so he went outside and saw the unfortunate victim riding her bike down the street. Although he had never met or seen the woman before, he attacked her without provocation and beat her to death.

¶ 74. The toxicology report done the day after the killing showed residual marijuana metabolites in defendant's blood but no other legal or illegal drugs in his system, except those attributed to medications he had been given at the hospital following his arrest. A court-appointed psychiatrist, Dr. Linder, met with defendant on five occasions at the Vermont State Hospital between September 29, 2000 and November 16, 2000, after which he filed a report concluding that defendant was insane at the time of the killing but competent to stand trial. Dr. Linder noted that defendant exhibited an abundance of severe psychiatric symptoms strongly suggesting that he had a major mental illness — either schizophrenia, schizophreniform disorder, or schizoaffective disorder — at the time of the killing. Dr. Linder also found limited evidence to suggest an alternative diagnosis — substance-induced psychosis with hallucinations and delusions — which he opined could be considered a mental disease "due to the incipient and unanticipated development of the condition while using significant substances for the first time." Dr. Linder concluded that defendant had been latently psychotic for years and that recent circumstances — including drug use — had set in motion a complete psychotic breakdown.

¶ 75. While acknowledging that drug use probably played a significant role in activating defendant's mental illness, Dr. Linder did not consider defendant's substance abuse to be the primary factor in his psychosis because of the long period of disordered thinking before defendant began his relatively brief period of using psychoactive drugs. Dr. Linder also opined that defendant could not have known or predicted the magnitude of his psychotic reaction to the drugs he took. Dr. Linder concluded that, by the time of the alleged offense, defendant had reached such a delusional and psychotic state of mind that he could not reflect rationally enough to refrain from killing either his beloved cat or a total stranger.

¶ 76. Based on Dr. Linder's report, the parties stipulated to defendant's competency to stand trial. Dr. Linder and Dr. Bertold Francke, defendant's treating psychiatrist at the state mental hospital, testified at a hospitalization hearing in the spring of 2001. Following the two-day hearing, the district court determined that defendant was still in need of mental health treatment and required continued hospitalization, finding, based on expert testimony, that (1) defendant's mental condition had been developing for many years; (2) a mental illness such as defendant's is usually a lifelong condition that often requires cyclical hospitalization; (3) defendant is likely to have more overt psychotic conditions at different times in his life; and (4) his condition will wax and wane over time. The court explicitly rejected the State's attempt to isolate defendant's past behavior from his then-current mental state, noting that his improved behavior did not demonstrate that he was no longer mentally ill.

¶ 77. Following notification of defendant's intent to rely upon an insanity defense, the State obtained permission for Dr. Albert Drukteinis to perform an independent psychiatric evaluation of defendant. In April 2002, Dr. Drukteinis filed a report in which he stated that defendant was suffering from psychotic thought at the time of the killing and thus was not able to appreciate the criminality of his conduct. Dr. Drukteinis concluded, however, that defendant had no prior history of a major thought disorder such as schizophrenia and that, in his opinion, defendant's psychotic state arose in the context of heavy drug abuse. According to Dr. Drukteinis, defendant had acted recklessly by accepting "the loss of contact with reality that the drugs routinely brought which was not altogether different than the psychotic state which they precipitated." Hence, Dr. Drukteinis opined that de-

fendant's voluntary drug use directly resulted in his psychotic state and the ensuing killing.

¶ 78. In June 2002, the district court transferred custody of defendant to the Department of Corrections after concluding that his continued hospitalization was no longer justified. The court based its decision on the testimony of the only witness — defendant's new treating psychiatrist at the state hospital, Dr. Margaret Bolton — who stated that defendant's psychosis had dissipated and that he had not been prescribed any anti-psychotic drugs since June 2001. Dr. Bolton opined that defendant did not suffer from either schizophrenia or borderline personality disorder.

¶ 79. In an ensuing deposition and follow-up letter, Dr. Linder concluded that defendant had been suffering from either schizophreniform disorder — a condition resembling schizophrenia, but with symptoms lasting only between one and six months — or a substance-induced psychotic disorder at the time of the alleged offense. Dr. Linder stated that defendant's genetic vulnerability and his long history of mental and emotional dysfunction predisposed him to develop a severe psychotic reaction to some of the psychoactive drugs he took in the months preceding the murder. According to Dr. Linder, however, defendant's sustained psychotic state — lasting several weeks after he stopped using the drugs — indicated that the psychosis he experienced was not purely drug-induced. Rather, Dr. Linder surmised that defendant's predisposition towards mental illness, activated by some combination of social, occupational, interpersonal, and substance-use stressors, caused defendant to be insane at the time of the offense.

¶ 80. Dr. Linder also emphasized that the psychotic state defendant experienced was well beyond the ken of altered states of consciousness anticipated or desired by drug users. Dr. Linder recognized that, in using the drugs, defendant anticipated that they might produce odd and unusual mental experiences but concluded that defendant could not have known the potential for the magnitude of the reaction that occurred. According to Dr. Linder, although defendant "may have been aware ... that to consume LSD might lead to short-term mental phenomena with perceptual and thinking distortions, he had no more capacity to predict the dramatic acute florid psychotic reaction than a nondrinker would be able to know that their first alcoholic drink would lead to a state of pathological intoxication with resultant psychosis and aggression."

¶ 81. Thus, Dr. Linder opined that defendant's psychosis on the day of the killing was not a "psychedelic experience" from LSD, but rather

was a response "seen rarely ... in individuals vulnerable and genetically predisposed where the toxic effects of LSD interact with a premorbid vulnerability to produce a sustained psychotic reaction." (Quotations omitted.) Dr. Linder surmised that:

> Without the predisposing elements of his susceptibility, the drug use alone would have probably not led to the resulting psychotic condition. Without the drug use, in an individual susceptible to decompensation as was Mr. Sexton, the deterioration probably would not have occurred within the same time frame and it may have been avoided altogether due to other interceding circumstances.

¶ 82. Defendant also presented an expert opinion from Dr. Scott Lukas, a clinical professor of psychiatry at Harvard Medical School, describing research suggesting that persons with a genetic predisposition to schizophrenia or "premorbid" schizophrenia (i.e., not yet clinically apparent) are more susceptible to a psychotic response to LSD use. Dr. Lukas concluded that "drug use can exacerbate an underlying and subthreshold psychiatric disorder" leading to psychosis, that defendant's "mental health history clearly puts him in this category," that his condition was not solely attributable to LSD use, and that defendant "was not likely aware of the impact that LSD use would have on him, particularly because he had been using it for such a relatively brief period of time." In Dr. Lukas's view, defendant's psychiatric condition was chronic, even if intermittent, and was not dependent on the use of LSD or any other illicit drug.

¶ 83. In light of the medical evidence presented as of June 24, 2003, the trial court asked defendant to "submit a concise statement of his theory as to the applicability of the insanity defense." In response, defendant submitted a letter from Dr. Linder, who opined that defendant had a mental disease at the time of the killing that could be diagnosed as either schizophreniform disorder or a substance-induced psychotic disorder. The letter stressed that even though defendant had ceased most drug use two to three weeks before the killing, the psychotic state triggered by the drug use had persisted well beyond the period of intoxication. According to the expert, defendant could not have predicted that the drugs would activate his underlying mental illness, thereby triggering the psychotic reaction.

¶ 84. Based on this proffer and other evidence, the trial court determined that defendant had presented sufficient evidence in support of

his insanity defense theory to reach the jury but posed the question of whether a substance-induced psychotic disorder should be recognized as a mental disease under our insanity-defense statute. The court concluded that generally it should not *unless* the defendant was not under the immediate influence of drugs at the time of the alleged offense and could not have known that his prior drug consumption would cause insanity by activating a medically recognized latent mental disease.

¶ 85. Accordingly, the court proposed an instruction allowing the jury to accept an insanity defense if (1) defendant's drug consumption activated a medically recognized mental disease that caused him to be insane at the time of the alleged offense; (2) defendant did not know and had no reason to know that his drug consumption would activate the mental disease; (3) the mental disease existed independently of any temporary intoxication or high caused by drugs; and (4) the mental disease lasted for a substantial period of time after the intoxicating effects of the drugs had worn off. The proposed charge also would inform the jury that the defense could not apply if the mental disease was caused solely by the consumption of drugs. Thus, the trial court precluded defendant from raising a defense claiming temporary insanity that resulted from either the direct intoxicating effects of drugs or solely the long-term use of drugs.

¶ 86. In seeking the instruction on insanity, defendant never claimed, and the expert witness never stated, that defendant's actions on the day of the offense were caused by intoxication — that is, an impaired mental state caused by the immediate effects of drugs or alcohol. Instead, defendant relied upon a variation of fixed or settled insanity, a branch of the insanity defense whereby a prolonged, if not permanent, mental disease or defect is caused by long-term alcohol or drug abuse. The trial court rejected the notion that settled insanity caused exclusively by drug use should be recognized as a defense in Vermont but found that this case involved an additional factor often not present in settled insanity cases — evidence that defendant had an underlying mental illness before he started abusing drugs and that his conduct was caused by both the underlying mental illness and his abuse of drugs.

¶ 87. The jury instruction represents a fusion of legal sources. In choosing the language, the trial court concluded that, under the circumstances, a branch of the insanity defense developed by the Massachusetts Supreme Judicial Court [hereinafter the Massachusetts defense] applied because it dealt explicitly with a situation where there was a preexisting mental illness before the drug use. The court relied

particularly on the Massachusetts Supreme Judicial Court's decision in *Herd.* There, the court applied the Massachusetts defense, which had been developed over a long line of cases, in a situation where the defendant also claimed settled insanity as a result of long-term drug use. Under that defense, a lack of criminal responsibility is established if the "voluntary consumption of a drug activated a latent mental disease or defect and, as a result of that mental disease or defect, the defendant lost the substantial capacity to understand the wrongfulness of his conduct or to conform his conduct to the requirements of the law" — unless the defendant knew or had reason to know that the drug would activate the illness. *Herd,* 604 N.E.2d at 1298.

¶ 88. Although the backbone of the district court's language is the Massachusetts defense, the court added additional elements. It recognized that the Massachusetts defense had been applied in cases in which the defendant was allegedly intoxicated at the time of the offense, thereby allowing the jury to determine whether the intoxication was such a controlling factor that it replaced the mental illness as the cause of the conduct. The court rejected this application of the defense, however, requiring instead that the underlying mental illness be activated by long-term drug use in the absence of any intoxication. In that sense, the instruction included aspects of the traditional fixed or settled insanity defense. The court took its specification of the elements of that defense from *Herd,* 604 N.E.2d at 1298-99, which in turn relied upon the leading case of *People v. Kelly,* 516 P.2d 875 (Cal. 1973), discussed *infra,* ¶¶ 114-19.

¶ 89. As I said in the opening points of this dissent, the trial court's instruction requiring elements from both the Massachusetts defense and the fixed or settled insanity doctrine represents the most restrictive insanity defense allowed anywhere in the country, apart from a few jurisdictions in which the issue is addressed by a specific statute. Absent such a statute, no other court has required all of these elements in a case involving both drug or alcohol consumption and a mental disease or defect. By its selective review of the facts, the majority suggests that defendant's offer of proof does not meet the elements the trial court developed in its instruction, particularly the elements derived from fixed or settled insanity. As shown above, however, there were ample facts for a jury to conclude that (1) defendant had engaged in long-term drug use that activated an underlying, medically accepted mental illness; (2) the mental illness was independent of the intoxicating effects of the drugs and lasted for a substantial period of time after

the murder — indeed, defendant's delusional thinking endured at least until the spring of 2001, several months after the killing; and (3) defendant did not know, nor could have known, that the drug use would trigger an underlying mental illness that would make him insane — in other words, he was incapable of conforming his actions to the requirements of the law.

## III.

¶ 90. Because the trial court's proposed instruction fuses elements from two sources, it is appropriate to look independently at each source against the background of our insanity statute and the relevant common law. I first examine Vermont's insanity statute.

¶ 91. The statutory test for insanity in Vermont, which is derived from and nearly identical to the Model Penal Code's provision on the insanity defense, is as follows: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks adequate capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." 13 V.S.A. § 4801(a)(1); see *State v. Smith*, 136 Vt. 520, 523, 396 A.2d 126, 127 (1978) (noting that § 4801 is derived from Model Penal Code § 4.01). Defendant has the burden to prove insanity "by a preponderance of the evidence." 13 V.S.A. § 4801(b). Because it is undisputed at this juncture of the case that defendant was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law at the time of the killing, the relevant question for purposes of this appeal is whether defendant's inability to do so was "a result of mental disease or defect."

¶ 92. As demonstrated above, there is ample evidence for a jury to conclude that, at the time of the alleged offense, defendant's inability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was a result of a latent mental illness triggered by past drug use. Indeed, the majority acknowledges Dr. Linder's opinion that but for the underlying mental illness, defendant's drug use would not have resulted in the psychotic state that led to the killing. Dr. Lukas added that "Mr. Sexton's psychiatric condition is chronic and is not dependent on the use of LSD or other illicit drugs." In other words, there is expert opinion supporting defendant's claim that his preexisting mental illness, independent of the effects of his drug use, was a cause in fact of the victim's death and a substantial factor — that is, a proximate cause — of the death. Even assuming that defendant's psychotic state may not have occurred absent his drug use,

there can be more than one proximate cause of defendant's insanity. See *Mobbs v. Cent. Vt. Ry.*, 155 Vt. 210, 219, 583 A.2d 566, 572 (1990) (trial court's use of indefinite article "correctly and unambiguously" informed jurors that more than one proximate cause is possible). Thus, under the plain meaning of the statute, defendant made a sufficient showing to enable his insanity defense to go to the jury.

¶ 93. The majority apparently disagrees, holding that defendant may not present an insanity defense under § 4801 even if he is insane as a result of a mental disease or defect, as long as the mental disease or defect *would not have occurred absent his voluntary use of illegal drugs*. In support of this test, the majority relies upon decisions from jurisdictions with statutes — unlike § 4801 — that explicitly preclude an insanity defense when prior drug use is a proximate cause of the defendant's mental condition. See, e.g., Conn. Gen. Stat. § 53a-13(b) (2001) ("It shall not be a defense under this section if such mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance . . . ."); Del. Code Ann. tit. 11, § 401(c) (2001) (same); Wash. Rev. Code § 10.77.030(3) (2002) ("No condition of mind proximately induced by the voluntary act of a person charged with a crime shall constitute insanity."). Thus, in those jurisdictions, if drug use is one of several proximate causes of the alleged criminal conduct, no insanity defense is available. See, e.g., *State v. Hanson*, 529 A.2d 720, 724 (Conn. App. Ct. 1987) (where trial court was presented with conflicting evidence concerning defendant's mental condition, court's refusal to allow insanity defense was supported by "the plain language of the statute" disallowing insanity defense based on claim that mental disease was caused by voluntary ingestion of drugs); *State v. Flagg*, No. 9804019233, 1999 WL 167775, at *2 (Del. Super. Ct. Mar. 10, 1999) (where statute forecloses insanity defense based on mental illness caused or exacerbated by drugs, defense is unavailable if insanity would not have occurred but for drug consumption because "[t]here may be more than one proximate cause of mental illness or insanity").

¶ 94. Obviously, those cases do not support the majority's construction of a statute that allows an insanity defense when the insanity is a result of a mental disease or defect — with no restriction on the etiology of that disease or defect. Although the Legislature has explicitly foreclosed the insanity defense when a defendant's mental condition is "manifested only by repeated criminal or otherwise anti-social conduct," § 4801(a)(2), our statute does not preclude an insanity

defense when a mental disease or defect is activated by voluntary drug use. As I said in my opening, what the majority has done here is to impose the statutes of Connecticut, Delaware, and Washington on Vermont law, as if the Vermont Legislature had adopted them. In fact, each of these statutes was adopted to change the law imposed by a more general statute and the common law. If a similar change is to occur in Vermont, it must come from the Legislature, not this Court.

¶ 95. Hence, basic concepts of proximate cause dictate that the majority's test conflicts with § 4801. "[C]ourts have generally treated legal causation in criminal law as in tort law . . . ." 1 W. LaFave, Substantive Criminal Law § 6.4(c), at 471 (2d ed. 2003); see, e.g., *State v. Bass*, 12 P.3d 796, 801 (Ariz. 2000) (setting same standard for determining superseding cause in criminal and tort cases); *State v. McFadden*, 320 N.W.2d 608, 613 (Iowa 1982) (affirming jury instruction that applied ordinary proximate cause principles to manslaughter statute). As with tort liability, criminal liability requires both cause in fact and proximate cause. 1 W. LaFave, *supra*, § 6.4(a), at 466. Further, concurrent causes may "simultaneously create a condition that no single cause could have brought about." Black's Law Dictionary 212 (7th ed. 1999); see *Mobbs*, 155 Vt. at 219, 583 A.2d at 572 (recognizing that there can be multiple proximate causes of accident).

¶ 96. Generally, the substantial-factor test is applied in multiple causation cases. *State v. McDonald*, 953 P.2d 470, 474 (Wash. Ct. App. 1998); see *Barry v. Quality Steel Prods., Inc.*, 820 A.2d 258, 264 (Conn. 2003) (defining proximate cause test as whether conduct is substantial factor in bringing about result, and defining concurrent cause as coexistent cause that actively joins other cause to bring about injury). Under that test, if a certain act or condition was a substantial factor in bringing about a criminal offense, that act or condition is not prevented from being a proximate cause by proof of the fact that it alone would not have resulted in the offense. See R. Perkins, Criminal Law § 9(c)(6), at 610-11 (1957) (discussing multiple causation in context of murder).

¶ 97. The same principles should apply when we are dealing with an affirmative defense rather than the initial liability for the charged crime. Cf. *State Farm Mut. Auto. Ins. Co. v. Roberts*, 166 Vt. 452, 455-56, 697 A.2d 667, 669 (1997) (noting that under doctrine of concurrent causation, insurance policy provides coverage when liability of insured arises from concurrent but separate acts, only one of which is covered by policy). At best, from the State's perspective, the evidence in this case indicates that defendant's insanity at the time of the alleged

offense arose from a combination of his latent mental illness and his prior drug use; neither one of these causes, independently, would have resulted in defendant's insanity, but they both played a substantial and necessary role in creating his psychotic state. Moreover, there was undisputed expert testimony that defendant had no way of anticipating that his drug use would trigger the psychotic state he was in at the time of the killing. Cf. *Estate of Sumner v. Dep't of Soc. & Rehab. Servs.*, 162 Vt. 628, 629, 649 A.2d 1034, 1036 (1994) (mem.) (noting that efficient intervening cause must be foreseeable).

¶ 98. Given this evidence, a jury could consider defendant's mental illness and his drug use to be separate, concurrent causes of his insanity and could conclude that his insanity — his inability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law — was a result of a mental disease or defect. See *id.* (noting that proximate cause is ordinarily jury issue unless proof is so clear that reasonable minds could not reach different conclusions). The Massachusetts defense, used in part by the trial judge, is simply an application of these standard principles of causation to the insanity defense so as to allow the defense to be raised when the evidence would support a jury determination that the mental illness caused — that is, was a cause in fact and a proximate cause of — the conduct for which the defendant is charged.

¶ 99. A review of the Massachusetts cases supports this point. In *Commonwealth v. Sheehan*, 383 N.E.2d 1115, 1118-19 (Mass. 1978), the court rejected the notion that either drug addiction alone or the normal consequences of the ingestion of drugs could qualify as a mental disease or defect, but acknowledged that "if the consumption of drugs causes a mental disease or defect, apart from drug addiction itself, normally the defendant may rely on that mental disease or defect in support of his assertion of his lack of criminal responsibility, even if the defendant's drug consumption was voluntary." Later, in *Commonwealth v. Brennan*, 504 N.E.2d 612, 616 (Mass. 1987), the court formally adopted the instruction that

> if the jury finds that the defendant had a latent mental disease or defect which caused the defendant to lose the capacity to understand the wrongfulness of his conduct or to conform his conduct to the requirements of the law, lack of criminal responsibility is established even if voluntary consumption of

alcohol activated the illness, unless he knew or had reason to know that the alcohol would activate the illness.

¶ 100. The *Brennan* court also noted that "the lack of substantial capacity must arise from the underlying disease or defect rather than the voluntary consumption of alcohol." *Id.* Nevertheless, in recognizing the necessity of a causal connection between the claimed mental disease and the defendant's inability to appreciate the wrongfulness of his conduct, the Supreme Judicial Court of Massachusetts has held that a defendant who was mentally ill at the time of the alleged offense is precluded from pleading insanity only if the defendant's inability to conform his conduct to the law is "solely" the result of his voluntary drug consumption. See, e.g., *Sheehan*, 383 N.E.2d at 1119; cf. *Commonwealth v. Shelley*, 409 N.E.2d 732, 738-39 (Mass. 1980) (rejecting defendant's insanity defense because, although experts testified that his consumption of one to nine beers may have facilitated his dissociative state without necessarily causing it, there was no evidence that his voluntary use of alcohol activated latent mental disease).

¶ 101. In contrast, under the majority's standard, a defendant cannot obtain an insanity defense if his insanity was caused to any significant degree by drug abuse. As I stated in the opening, this effectively imposes an insurmountable burden on defendants, as recognized by the New Jersey Supreme Court in *State v. Maik*, 287 A.2d 715, 722 (N.J. 1972):

> In the case at hand, the medical thesis was somewhat different, for the underlying illness from which the psychotic episode emerged was not caused by the use of drugs. Rather the thesis was that the drugs, acting upon that underlying illness, triggered or precipitated a psychotic state which continued after the direct or immediate influence of the drug had dissipated, and that it was the psychosis, rather than the drug, which rendered defendant unable to know right from wrong at the time of the killing. In other words, defendant urges that when a psychosis emerges from a fixed illness, we should not inquire into the identity of the precipitating event or action. Indeed, it may be said to be unlikely that the inquiry would be useful, for when, as here, the acute psychosis could equally be triggered by some other stress, known or unknown, which the defendant could not handle, a medical opinion as to what did in fact precipitate the psychosis is not apt to rise above a speculation among mere possibilities.

A "speculation among mere possibilities" is essentially the end of the inquiry under the standard imposed by the majority, particularly because defendant has the burden of proving insanity.[20]

¶ 102. The majority holds that defendant may not present an insanity defense under § 4801 even if he is insane as a result of a mental disease or defect, so long as the mental disease or defect *would not have occurred absent his voluntary use of illegal drugs.*[21] As noted, however, in so holding, the majority relies exclusively upon decisions from jurisdictions with statutes — unlike § 4801 — that explicitly preclude an insanity defense when prior drug use is a proximate cause of the defendant's mental condition. Thus, those decisions offer no support for the majority's position.

¶ 103. Apart from those decisions, the majority has come up with one federal case that it says supports its position on proximate causation — *United States v. Henderson,* 680 F.2d 659 (9th Cir. 1982). Not surprisingly, it is an intoxication case where the evidence indicated that defendant's conduct could have been caused by his intoxication resulting from the consumption of alcohol immediately before the criminal conduct. As I stated earlier, everyone agrees — as reflected in the trial court's proposed charge — that defendant cannot rely upon an insanity defense if his conduct was caused by the intoxicating effects of the drugs he took. Ironically, in *Henderson,* the court concluded that "the

---

[20] In passing, the majority states that when a defendant presents evidence of insanity, "the State may offer evidence to prove that the voluntary ingestion of intoxicants was an essential causal element of the insanity so as to refute the claim that the insanity absolves the defendant of criminal responsibility." *Ante,* ¶ 35. In support of this proposition, the majority cites *State v. Hanson,* 529 A.2d 720, 724 (Conn. App. Ct. 1987), wherein a Connecticut appellate court made a similar statement after noting that Connecticut's insanity statute explicitly precluded an insanity defense if the voluntary ingestion of drugs proximately caused the mental illness. The *Hanson* court was also reviewing whether the trial court, in acting as factfinder, properly rejected the insanity defense, not whether the defendant should have had an opportunity to present the defense to the factfinder. *Id.* In any event, our statute provides that "[t]he defendant shall have the burden of proof in establishing insanity as an affirmative defense by a preponderance of the evidence." 13 V.S.A. § 4801(b). Thus, at most, the majority is imposing a burden of production on the State, with the defendant retaining the burden of proving that he is entitled to an insanity defense.

[21] It is difficult to pin down the standard the majority is using. It is described often as the "essential causal element" standard, *ante,* ¶ 33, but ¶ 35 makes clear that it is a traditional "but for" test. Note that where, as here, the defendant has the burden of proof, the defendant must prove that drug use does not meet the "but for" test.

Government failed to introduce sufficient evidence to meet its burden" to "prove that the alcohol, and not the mental disease, actually caused the defendant's mental incapacity when the crime was committed." *Id.* at 662.

¶ 104. Beyond *Henderson*, the majority relies upon several inapplicable intoxication cases involving defendants who committed crimes while under the direct influence of intoxicating drugs and who did not have an independent, underlying mental disease or a settled mental condition brought on by long-term drug use. See, e.g., *United States v. Bindley*, 157 F.3d 1235, 1241-42 (10th Cir. 1998) (defendant committed armed robbery while under influence of PCP-laced marijuana cigarette); *People v. Velez*, 221 Cal. Rptr. 631, 632-33 (Ct. App. 1985) (defendant committed aggravated assault with deadly weapon while under influence of PCP-laced marijuana cigarette); *State v. Hall*, 214 N.W.2d 205, 207-08 (Iowa 1974) (defendant committed murder while under influence of LSD and did "not contend that extended use of drugs caused him 'settled or established' insanity"); *State v. Sette*, 611 A.2d 1129, 1132 (N.J. Super. Ct. App. Div. 1992) (defendant committed murder after ingesting large amounts of cocaine); *Commonwealth v. Campbell*, 284 A.2d 798, 799 (Pa. 1971) (defendant committed murder while under influence of LSD and amyl nitrate). In short, those cases all involved intoxication as a defense, exactly what defendant has not raised here and what the trial court's instruction precluded.

¶ 105. In summary, the trial court's decision stands in stark contrast to the majority's refusal to allow an insanity defense unless the charged conduct would not have occurred but for the drug use. In my view, we should accept the trial court's statement of the law because it applies standard principles of causation to defendant's burden under our insanity defense statute and allows the defense to be raised when the evidence would support a jury determination that the defendant's insanity was a result of a mental illness — which is all that is required by the statute. I would accept the Massachusetts defense even if this were an intoxication case, but such a holding would be dicta on this record, and I recognize that the majority has some case law that can be interpreted as rejecting the Massachusetts defense *in intoxication cases*. The majority's rejection of the Massachusetts defense in a nonintoxication case such as the instant one, however, is unexplained and unsupported.

## IV.

¶ 106. I could end this dissent at this point because adoption of the Massachusetts defense, with the additional element from the doctrine of fixed and settled insanity, would narrowly answer the certified question presented to us, and defendant has accepted the trial court's language without cross-appealing from it.[22] But the majority has rejected the proposed instruction, including the element from the settled insanity defense, while stating "that this appeal [does not] present[] a suitable factual setting for resolution of the issue." *Ante*, ¶ 27. It is this decision that has created the greatest unfairness for defendant by changing the question that the district court certified to us. I think it is beyond argument that defendant's offer of proof met the fixed or settled insanity elements found in the proposed instruction. He has had no opportunity to argue that he could meet a more difficult standard. The majority now tells him that it does not have a standard, but, if it did, he would not meet it. Thus, not only has defendant been deprived of the opportunity to make an offer under an ascertainable standard, he faces appellate fact-finding inconsistent with the offer he did make.

¶ 107. The unwillingness of the majority to address fixed or settled insanity is particularly curious because it has directly rejected the philosophical basis for the defense. The trial court added to its jury instruction that in order to find insanity the jury must find that defendant neither "knew nor had reason to know that the drug would activate the illness." The majority rejected that element because it "runs counter to the fundamental principle that a defendant is not excused from criminal liability for acts which result from a mental state that is self-induced through the voluntary ingestion of illegal drugs or alcohol." *Ante*, ¶ 33. The majority would be much more forthcoming by rejecting fixed or settled insanity as a defense rather than manipulating the facts to avoid that holding.

¶ 108. In my view, the trial court's and majority's rejection of a pure settled-insanity defense in this case is unsupportable. In reaching its decision on settled insanity, the trial court adopted a narrow definition of mental disease or defect excluding any mental condition that was solely the result of drug usage. This definition is plainly inconsistent

---

[22] Although defendant requests that we "affirm the trial court's rulings below," he briefed the case as a settled insanity case.

with the Model Penal Code, and thus 13 V.S.A. § 4801. Like § 4801, § 4.01 of the Code neither defines the term "mental disease or defect" nor limits application of that term based on the etiology of the disease or defect; rather, the Code "treats the question of disease as one of fact, to be determined by the court or jury on the evidence presented in the cases that arise." Model Penal Code § 4.01 cmt. 4, at 174 (1985); see also *id.* § 4.01 app. C at 212 (stating in model jury charge for jurisdictions following Code that question of whether mental disease or defect exists must be determined by triers of fact based on evidence before them, including testimony of medical experts); cf. *State v. Bishop*, 128 Vt. 221, 227-28, 260 A.2d 393, 398 (1969) (noting that trial courts give considerable latitude in admitting evidence of insanity, and it is for jury to determine whether evidence pointing to defendant's sanity was sufficient to outweigh evidence of insanity).

¶ 109. Like Vermont, "[m]ost jurisdictions relying on the Model Code formulation have ... not provided a definition of mental disease or defect." Model Penal Code § 4.01 cmt. 5, at 176. When those jurisdictions have departed from the Code by making the availability of the insanity defense dependent on the etiology of the mental disease or defect — in particular when drug use is a causative factor — they have generally done so legislatively. Although our Legislature has expressly defined the term "mental disease or defect" in some ways, it has not chosen to limit the term in the way the majority has done today. Both our statute and the Model Penal Code contain the so-called sociopath exception, which provides that a mental disease or defect does "not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." 13 V.S.A. § 4801(a)(2); Model Penal Code § 4.01(2). Further, § 4801(a)(2) explicitly provides that a mental disease or defect includes "congenital and traumatic mental conditions as well as disease." 13 V.S.A. § 4801(a)(2). Thus, the Legislature has demonstrated that it will limit or expand the definition of "mental disease or defect" when it sees fit; yet, nothing in § 4801 suggests that the Legislature intended to limit the insanity defense based on the particular etiology of the disease or defect or to exclude the defense when the mental disease or defect is induced or exacerbated by alcohol or drug use.

¶ 110. Moreover, the Model Penal Code, upon which our statute is based, treats the etiology of a "settled" mental disease or defect as immaterial with respect to the availability of the insanity defense, even when drugs are a causative factor. As stated in its commentary on intoxication:

> *Under the Model Penal Code as under existing law, it is immaterial that mental disease excluding responsibility was caused by excessive drinking and in that sense is attributable to the defendant.* This sort of disease, generally delirium tremens, is said to be "fixed" or "settled." The same treatment is proposed for those periods of temporary disorientation (in alcoholic psychosis) that can occur after a long drinking bout. *The Model Code permits such cases to be dealt with under Section 4.01, and nothing in the formulation here undertakes to influence the resolution of the issue whether serious temporary disorientation from reality following intoxication constitutes "mental disease" within the meaning of that section.* The matter thus will become a question of the evidence that can be adduced on the occasion, as well as the development of the concept of "mental disease" in the general application of the insanity defense.

Model Penal Code § 2.08 cmt. 2, at 362-63 (emphasis added) (footnotes omitted).

¶ 111. In dismissing the above-quoted comment because it is contained in a Code section on intoxication not formally adopted by this Court, the majority misses the point. The question is not whether the commentary controls, but whether the common law controls. The commentary merely notes the inescapable fact that settled insanity is widely accepted under existing common law, and, as this Court has often observed, "the common law 'controls unless modified by statute or case law.'" *State v. Francis*, 151 Vt. 296, 305, 561 A.2d 392, 397 (1989) (quoting *State v. LeBlanc*, 149 Vt. 141, 142, 540 A.2d 1037, 1038 (1987)).

¶ 112. That the common law has long recognized settled insanity as a complete defense to criminal responsibility cannot be disputed. It has been generally accepted that the existence of a mental disease or defect caused by the long-term effects of intoxicants warrants an insanity defense. See J. Dressler, *supra*, § 24.05[B], at 329 ("The law distinguishes between mental impairment that does not extend beyond the period of voluntary intoxication, for which no defense is available, and insanity resulting from long-term use of drugs or alcohol."); 2 W. LaFave, *supra*, § 9.5(h), at 56-57. ("[A] temporary mental condition brought about by use of alcohol or drugs, as compared to a 'settled' or 'established' form of insanity, is not sufficient for a defense of insan-

ity."). Although the subject finds little direct discussion in Vermont, one nineteenth-century case suggests that while voluntary intoxication may mitigate but generally does not excuse criminality, an insane person is not "punishable for his criminal acts" and "in the eye of the law a person in the paroxysms of *delirium tremens* was insane." *State v. Tatro*, 50 Vt. 483, 486 (1878) (summarizing trial court's jury charge).

¶ 113. The principle that long-term substance abuse may result in a settled or fixed mental disease sufficient to excuse criminality may be traced to early English common law, L. Tiffany, *The Drunk, the Insane, and the Criminal Courts: Deciding What to Make of Self-Induced Insanity*, 69 Wash. U. L.Q. 221, 224-25 (1991), and has now been accepted by the vast majority of state courts (twenty-nine out of thirty at last count) that have considered the issue. A. Levine, *Denying the Settled Insanity Defense: Another Necessary Step in Dealing with Drug and Alcohol Abuse*, 78 B.U. L. Rev. 75, 97 (1998); see also *Herd*, 604 N.E.2d at 1299 ("The weight of authority in this country recognizes an insanity defense that is based on a mental disease or defect produced by long-term substance abuse."). The *only* court that has rejected the defense did so primarily because it was inconsistent with that state's intoxication statute, which expressly provided that intoxication did not constitute a mental disease. See *Bieber v. People*, 856 P.2d 811, 816 (Colo. 1993). There is no equivalent Vermont statute.

¶ 114. The oft-cited modern case on settled insanity, *People v. Kelly*, 516 P.2d at 883, is in all relevant respects *identical* to our case and stands for the generally accepted proposition that a mental illness triggered by drug use need only be settled, and not necessarily permanent, in nature to provide a complete defense to a crime. The defendant in that case started taking drugs when she was fifteen years old and used mescaline and LSD up to 100 times in the months leading up to the day she attempted to stab her mother to death. Several psychiatrists testified that the defendant had latent personality defects with a tendency to withdraw from reality but was not overtly schizophrenic until her repeated use of LSD triggered a psychotic state in which she was unable to distinguish right from wrong. The court-appointed psychiatrist testified that the defendant most likely would have been sane at the time of the offense if she had not taken the LSD in the months preceding the crime. Noting that defendant's psychosis extended well beyond the period in which she was under the direct influence of the LSD, *id.* at 878 n.9, the California Supreme Court reversed the trial court's rejection of the defendant's insanity defense

because her psychosis, while not permanent, had become settled beyond the period of intoxication. *Id.* at 882-83.

¶ 115. Although other courts have wrestled with the question of the length of time the psychotic state must last beyond the period of intoxication to be of a settled nature, see, e.g., *People v. Skinner*, 228 Cal. Rptr. 652, 660-61 (Cal. App. 1986) (holding that settled must mean fixed and stable for reasonable period of time and not solely result of recent ingestion of drugs, and refusing to allow settled insanity defense to defendant who murdered his wife shortly after free-basing cocaine), they have nonetheless generally agreed that the defense is available to defendants whose use of drugs resulted in a mental disease or defect that prevented them from appreciating the criminality of their conduct, as long as the resulting illness was settled for a reasonable period of time beyond the period of direct intoxication from the drugs. See, e.g., *Porreca v. State*, 433 A.2d 1204, 1207-08 (Md. Ct. Spec. App. 1981) (reversing trial court's refusal to allow insanity defense where evidence indicated that defendant's long-time use of PCP, and possible latent mental disorder, triggered psychotic state that caused him to kill his wife and that lasted two to four months after direct intoxicating effects of drug had abated); *People v. Conrad*, 385 N.W.2d 277, 280-81 (Mich. Ct. App. 1986) (reversing trial court's refusal to allow insanity defense where evidence indicated that defendant's use of PCP triggered settled psychotic state that persisted for six weeks after his drug use and that resulted in murder of his brother); *Maik*, 287 A.2d at 722 (rejecting trial court's instruction that insanity defense was not available where defendant's psychosis was triggered by his voluntary use of LSD and holding that defendant is entitled to insanity defense when drug use triggers settled psychotic state that prevented defendant from telling right from wrong).

¶ 116. The majority tries to get around *Kelly, Porreca, Conrad*, and *Maik* through appellate fact-finding that is totally inconsistent with the limited standard of review that it should be applying. According to the majority, *Kelly* and *Porreca* are distinguishable because the defendants in those cases were long-term abusers of drugs. *Ante*, ¶ 29 n.12. Yet, the evidence in this case is very similar — defendant smoked marijuana for years and did other drugs before he began experimenting with LSD

in the months leading up to the killing.[23] The majority says that *Maik* is distinguishable because the evidence in that case indicated that the defendant's mental illness may have resulted from depression or a failed romantic relationship rather than LSD use. *Id.* Ironically, the evidence here is similar — one of the psychiatrists stated that factors like defendant's break-up with his girlfriend may have triggered his psychotic reaction.

¶ 117. In short, even though the evidence in this case is nearly identical to that in *Kelly* and its progeny, the majority insists that the *Kelly* line of cases is distinguishable because there is no "evidence that defendant here had developed a fixed insanity through long-term substance abuse." *Id.* As noted above, the majority's rhetoric that defendant's claim is "contrary to the very meaning of the doctrine" and "would defeat the doctrine's meaning and underlying purposes" is grounded on its viewing the evidence most favorably to the State. *Id.* ¶ 29. In the end, as it ultimately acknowledges, see *id.* ¶ 29 n.12, the majority is simply rejecting *Kelly*, along with the accepted common law in this country.

¶ 118. As noted, there was ample evidence demonstrating that defendant had abused drugs for years, culminating in his heavy use of LSD in the months leading up to the killing, and that his mental illness was chronic and lasted for months after the killing. Moreover, as set out above, there was expert testimony that defendant's mental state at the time represented a settled psychosis resulting, at least in part, from his prior drug use. The expert testimony indicated that the psychosis was not caused solely by the ingestion of the drugs, but rather was the result of a preexisting mental illness activated, at least in part, by drug use. In short, just as the preexisting mental illness was a proximate cause of defendant's conduct, so was the drug ingestion. The facts clearly support a settled insanity defense.

¶ 119. The latter sentence requires emphasis. While I believe that *Kelly* and its progeny represent the appropriate standard to go to the jury, there is ample evidence for defendant to reach the jury on the standards contained in the cases cited by the majority. See *Allen v. State*, 539 So. 2d 1124, 1126 (Ala. Crim. App. 1988) ("The trial judge properly refused to charge on mental disease or defect because the only evidence presented at trial was that the defendant was suffering from voluntary intoxication."); *State v. Valenzuela*, 559 P.2d 201, 204 (Ariz.

---

[23] The facts of this case and *Kelly* are so nearly identical that the facts of one opinion could be substituted with the facts of the other without the reader even noticing.

Ct. App. 1977) ("In the instant case, there was simply no evidence to support a finding that the appellant was suffering from an existing state of mental illness . . . ."); *People v. Free*, 447 N.E.2d 218, 232 (Ill. 1983) ("There is no evidence in the record that this defendant was a habitual or chronic user of drugs or alcohol, or that the claimed disease or defect was 'settled' or 'fixed.'"). Indeed, Dr. Lukas described defendant's condition as "chronic," exactly the term the majority uses to describe a proper fixed or settled insanity defense. *Ante*, ¶¶ 26, 29 n.12. The problem here is the majority's appellate fact-finding, not the strength of defendant's evidence.

¶ 120. In sum, only because defendant has not challenged the proposed instruction, I would answer the certified question in the affirmative and allow the jury instruction proposed by the district court. I would add, however, that our acceptance of the instruction would be because of the posture of the case and not because a defense of fixed and settled insanity, as it is understood in the common law, falls outside the scope of 13 V.S.A. § 4801.

## V.

¶ 121. Proper adherence to common law doctrine in this case would require us to uphold the trial court's decision. The majority's opinion is a pure policy decision imposed without regard to the governing statute and without regard to defendant's factual showing. Absent legislative direction, I decline to join a decision that effectively denies defendants who commit offenses while mentally ill an opportunity to present to the jury an insanity defense that is not precluded by our insanity defense statute. Notwithstanding the brutal and senseless nature of the offense committed in this case, we must not forget that "[i]t is as much the duty of the state to protect an insane man from conviction, as it is to prevent a sane man from escaping that result." *State v. Warner*, 91 Vt. 391, 393, 101 A. 149, 150 (1917). I respectfully dissent.